*In re* CARLOS FRANCO SOTO, querellado.

*Número:* MC-84-14      *Resuelto:* 29 de octubre de 1984

*Miguel Pagán, Subprocurador General,* y *Rosa Negrón de Quiñones, Procuradora General Auxiliar,* abogados de El Pueblo; *Hiram A. Sánchez Martínez,* querellante, *pro se; Rodolfo Cruz Contreras,* abogado del querellado.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

El 29 de marzo de 1984 referimos a la Oficina del Procurador General de Puerto Rico para que investigara e informara sobre la comunicación del Lic. Hiram A. Sánchez Martínez, Director Ejecutivo de la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía, en torno a la conducta profesional del Lic. Carlos M. Franco Soto. El Procurador General, mediante previas declaraciones juradas to-

madas a los licenciados Sánchez Martínez y Franco Soto, rindió su informe.

En esencia, de dichas declaraciones se desprende que el 27 de marzo de 1984 el licenciado Franco Soto visitó la oficina del licenciado Sánchez Martínez para manifestarle la preocupación de los padres de la aspirante Arvia Ramírez Padró por no haber aprobado el examen de reválida en varias ocasiones anteriores.

Durante esa visita ocurrió el siguiente incidente:

Procurador General Auxiliar:

P. ¿De qué habló el Lic. Franco con usted y que lo conversado con usted fuera motivo de preocupación en relación al puesto que usted tiene como Director Ejecutivo de la Junta Examinadora?

Lic. Sánchez Martínez:

R. Ese día, como en las ocasiones anteriores, él me saludó muy efusivamente y conversamos sobre temas generales y me dijo que en ese mismo día enterraban al ex-representante Quique Cátala en Yauco, que había muerto el día antes o días antes, y a renglón seguido introdujo el tema obligado de todas sus visitas, que era el del estado emocional tan adverso en que se encontraban los padres de la aspirante Arvia Ramírez. Quiero aclarar que en ningún momento en sus gestiones él se refirió a estado emocional o físico de la aspirante. En todo momento se refería a la preocupación y estado emocional del Lic. [Luis A.] Ramírez por su hija no haber aprobado el examen y le dio énfasis al hecho de que el Lic. Ramírez había tenido que ser atendido por médicos y que la esposa del Lic. Ramírez había pasado por unos problemas de salud tremendos y que la situación para los padres de doña Arvia era desesperante y él como amigo tenía que hacer cualquier gestión que pudiera en alguna forma darle consuelo a ellos, era su explicación, como amigo, y que don Luis estaba muy preocupado por morirse y dejar a su hija sin un título y era una preocupación cont[i]nua de él, era como un gravamen a su espíritu esa preocupación, no poderle dejar un título por no haber aprobado ese examen; *y que el estado de desesperación de don Luis era tal que le había comentado, don Luis le había comentado a él, que mirara a ver si podía ir a San Juan y conseguir el*

*examen de reválida, que él podía conseguir hasta diez mil pesos para eso, pero que por supuesto ese era un comentario dentro de la frustración de padre, y que como él era su amigo, tenía que ayudarlo en todo lo que estuviera a su alcance, porque a él también le preocupaba el estado de salud de su amigo, el Lic. Ramírez. Eso en específico fue lo que me preocupó realmente.*

P. ¿Qué fue lo que le preocupó a usted realmente de la conversación?

R. Hasta ese momento yo había sido bastante tolerante, y lo digo porque se trataba de una persona que era mucho mayor que yo, tanto el Lic. Franco como el Lic. Ramírez; y hasta ese momento yo siempre pensé que en realidad lo que se pretendía de mí, la ayuda que se pretendía de mí, era orientación sobre pasos y medidas que debía ella seguir en cuanto a tipo de estudio. Yo había sido profesor por dos años en la Escuela de Derecho de la Universidad Interamericana y a base de esa experiencia podía decirle a los aspirantes, tanto en las actividades de foro en que participaba y en mi capacidad oficial, sobre la necesidad de que los aspirantes limiten sus contestaciones a lo que se le[s] pide; que no hagan digresiones, porque pierden su tiempo, y ese tipo de información que está a mi disposición ofrecérsela a los estudiantes, no importa si los conozco o no, a manera de orientación. El Reglamento incluso nos impone eso. Hasta ese momento yo pensaba que se me estaba pidiendo m[á]s bien un tipo de orientación.

P. ¿Qué le hizo pensar a usted entonces que esa no era la intención del Lic. Franco?

R. *Bueno, yo no sé cuál fue la intención del Lic. Franco, pero yo le puedo dar la impresión que recibí en ese momento.*

P. ¿Cuál fue la impresión que usted recibió en ese momento que él le indica que el papá de la señora Ramírez tenía diez mil dólares para comprar el examen de reválida?

R. Como él lo dijo, que había sido un comentario del Lic. Ramírez, yo entendí que al él repetirlo, *lo que yo entendí en aquél momento, que pudo haber ocurrido, que yo dijera que yo estaba en disposición, por esa cantidad de dinero, de hacer un esfuerzo ilícito para ayudarla, bien fuera consiguiéndole copia del examen o alterando documentos.* Yo pensé que las visitas consecutivas del Lic. Franco, que originalmente se habían mantenido en los linderos de lo propio, eran una apelación

sutil a mi posición, ya que ese comentario había llegado a un punto donde se me estaba pidiendo sutilmente una colaboración que yo como funcionario público no podía dar y como persona honrada me resistiría a ofrecer.

P. Cuando el Lic. Franco le manifiesta que el Lic. Ramírez tenía $10,000 para comprar el examen de reválida para su hija, ¿hizo usted algún comentario en ese momento?

R. No, yo traté de permanecer sereno, porque en mi interior se produjo una conturbación profunda. Yo había oído decir que cuando ocupara ese cargo iba a recibir presiones, iba a recibir acercamientos de aspirantes o terceras personas para conseguir ventajas o privilegios que no tenían los estudiantes en el curso ordinario de los procedimientos, pero jamás imaginé que pudieran provenir de personas que debían conocer sus obligaciones legales y éticas como el caso de los licenciados Franco y Ramírez. Después de pasar el "shock" recuerdo que mi reacción fue decirle que el Tribunal había emitido una resolución en la cual le requería a los egresados de universidades extranjeras que tenían que tomar cinco cursos en escuelas de derecho de Puerto Rico y que la señora Arvia Ramírez recibiría en el correo la correspondiente notificación. Entonces él me contestó, "Ah bueno, pues no se puede hacer nada"; y yo le dije que sí, que la convenciera de que tomara esos cursos, porque era de la única forma, es decir, con una mejor preparación académica, que ella podría salir airosa del proceso.

P. ¿Cuándo le manifesta "entonces no se puede hacer nada", en ese momento, sabía usted a conciencia a qué él se refería?

R. En ese momento percibí que fue un comentario que él hizo como queriendo decir que ya su gestión no tenía . . . había perdido su propósito si ella no podía tomar el examen.

P. Licenciado Sánchez, yo le pregunto específicamente, durante la visita del viernes 23 de marzo de 1984 del Lic. Franco a usted y decirle que el papá de la señora Ramírez tenía diez mil dólares para comprar el examen de reválida, dígame, ¿se sintió usted que lo estaban sobornando o que querían sobornarlo?

R. Mi gran conturbación se debió a que me sentí de esa forma.

P. ¿Le hizo usted algún comentario con relación a sus sentimientos al Lic. Franco en ese momento?

R. Ninguno. Tan sólo desee que se terminara la conversación y que él se fuera para yo hacer lo que hice.

P. ¿Qué usted hizo?

R. Tan pronto él se marchó salí de mi oficina apresuradamente y me dirigí a la oficina del Honorable Juez Hiram Torres Rigual, Presidente de la Junta Examinadora, a decirle lo que había pasado; porque yo me prometí a mí mismo que cuando yo sintiera que alguien me estuviera presionando o intentando conseguir algún privilegio al cual no tuviera derecho, se lo informaría al Presidente de la Junta, porque mi interés es ser un funcionario íntegro y que no se pueda decir que vició o participó conscientemente para viciar el procedimiento a su cargo. De hecho, cuando esperaba el ascensor salía el Juez Torres Rigual del mismo y yo le expuse la experiencia por la cual acababa de atravesar.

P. Después que el Juez lo escuchó a usted, ¿qué hizo él si algo?

R. Él me dijo que a su juicio eso debía ser remitido a la consideración del Tribunal en pleno para que se decidiera el curso a seguir. (Énfasis suplido.)

Por su parte, en lo pertinente, el licenciado Franco Soto declaró:

P. ¿Conoce usted personalmente al Lic. Hiram A. Sánchez Martínez?

R. Le conozco.

P. ¿Desde cuándo?

R. Más o menos hace un par de años.

P. En relación a la comunicación del Lic. Sánchez Martínez, fechada el 28 de marzo, copia de la cual le fue suministrada a usted por esta Oficina, le pregunto, cuál es su versión en relación a lo expresado por el Lic. Sánchez Martínez.

R. Esencialmente yo le diría que lo alegado por el Lic. Sánchez Martínez en su memorandum de fecha 28 de marzo de 1984 es todo cierto; pero entiendo que se sensibilizó demasiado, porque no hubo intención ni de sobornarlo ni de traerle

a su consideración lo dicho por el Lic. Ramírez en el sentido de que aceptara *y no hubo oferta de mi parte, sino traerle a él hasta donde había llegado la preocupación de los padres de Arvia Ramírez; porque lógicamente yo no podía ofrecerle nada a él*, porque ya él me había dicho que la Lcda. Arvia Ramírez no iba a ser admitida para la reválida debido a que había una Resolución del Tribunal Supremo en donde le indicaba a ella y a 5 ó 6 personas más, que tenían que tomar unos cursos para poder ser admitidas a tomar la reválida. Es más, él me había indicado las asignaturas en las cuales el Supremo recomendaba ella se matriculara para ser admitida al examen; y de ésto yo tenía conocimiento anterior, porque en una reunión, o sea, una visita anterior que yo le había hecho él me lo había manifestado. Así es que cómo usted piensa que yo podía ofrecerle algo a él, o una insinuación, cuando la Lcda. Arvia Ramírez no iba a ser admitida a la reválida; no cabe en mente soborno de clase alguna. O sea, yo entiendo que él tiene una integridad bien cimentada, absoluta, y que no es el tipo de funcionario que pueda corromperse, por lo cual le tengo una alta estimación. Esto no afecta mi estimación hacia él y lamento que él me haya malinterpretado, porque nunca pasó por mi mente, ya que no podía pasar, por lo que le he dicho anteriormente, que no le iban a dar el examen; no era de sentido común. Si le hubieran ido a dar el examen, mi posición sí hubiera sido bien grave.

P. Antes del 23 de marzo de 1984, fecha en que usted visitó por última vez al Lic. Sánchez Martínez, ¿le había visitado anteriormente?

R. Sí.

P. ¿Cuántas veces?

R. Dos o tres veces.

P. ¿Hablaron de la señora Arvia Ramírez y del interés de ella en tomar los exámenes de reválida?

R. Sí.

P. En esas visitas anteriores, ¿le había comunicado a usted el Lic. Sánchez que surgiera la posibilidad de que la candidata doña Arvia Ramírez no pudiera tomar el examen de reválida durante el mes de marzo de 1984?

R. Me lo había dicho y me lo había dicho con anterioridad a

la reválida de marzo último. Esto mismo se lo comuniqué a la Lcda. Arvia Ramírez y ella no solicitó para concurrir en ese examen, me parece; yo se lo dije, que no podía solicitar.

P. ¿Cuál era el motivo de su visita al Tribunal Supremo y específicamente a la Junta Examinadora?

R. Para conseguir los exámenes ya después de ofrecidos.

P. ¿Con qué propósito?

R. Llevárselos a ella y que ella los estudiara.

P. Licenciado Franco, yo le pregunto, ¿cómo conoció usted al Lic. Sánchez Martínez?

R. Porque yo vine al Supremo y pregunté quién era el Director Ejecutivo de la Junta de Aspirantes al Ejercicio de la Abogacía, y allí me indicaron que era el Lic. Sánchez Martínez, y él muy gentilmente me recibió. Ese muchacho siempre me ha recibido muy gentilmente.

P. Cuando le informaron que el Director Ejecutivo de la Junta era el Lic. Sánchez Martínez, ¿tenía usted conocimiento personal de que él procedía del pueblo de Yauco?

R. No.

P. ¿Cuándo lo supo?

R. Cuando hablé con él.

P. Durante esa primera conversación, ¿cómo surge el nombre de la aspirante Arvia Ramírez Padró?

R. Porque yo le indiqué a él que quería ver al Director Ejecutivo para ver si conseguía los exámenes que ya se habían dado en el Supremo para llevárselos a ella para que ella los estudiara.

P. Específicamente, Lic. Franco, en relación a los $10,000 que alega el Lic. Sánchez que usted le dijo tenía el papá de la señora Ramírez para comprar un examen de reválida, ¿cómo advino este hecho a su conocimiento?

R. Porque el Lic. Ramírez está muy mal de salud, tan mal que en los últimos 5 ó 6 meses ha sido hospitalizado como 5 ó 6 veces, y una vez que estuve en su oficina a buscar una copia de una escritura, me dijo que tenía una preocupación intensa, porque pensaba que se iba a morir pronto *y le hubiera gustado tener la satisfacción personal antes de la muerte que su hija*

*pasara la reválida y verla practicar, si era que iba a prac-*
*ticar, y dentro de la conversación que tuvimos me dijo que se*
*atrevía . . . o que tenía $10,000 . . . que tenía hasta $10,000, me*
*dijo, para obtener un examen de reválida.*

P. En adición a las preguntas que yo le he formulado en
relación a esta investigación, ¿usted quisiera añadir algo a esta
declaración que me ayude a hacer una evaluación de la inves-
tigación que estamos realizando?

R. Con mucho gusto, quiero decirle que en mi conversación
con el Lic. Sánchez Martínez, la cual consideraba que era de
una manera informal, *si le traje a él la referencia a los diez*
*mil pesos era para hacerle llegar a él la preocupación de los*
*padres de la Lcda. Ramírez, pero en ningún momento le hice*
*oferta de clase alguna, porque él no lo dice ahí, no le hice oferta,*
*ni creo haberle hecho insinuación de clase alguna porque no*
*tuve la intención de así hacerlo en este aspecto, porque la Lcda.*
*Ramírez no iba a ser admitida a tomar el examen. No con-*
*sidero a mal lo que ha hecho él, porque le repito, que lo con-*
*sidero una persona íntegra, incorruptible. Mi opinión es que él*
*no tiene precio.* (Énfasis suplido.)

A la luz de estas declaraciones, el Procurador General
"entiende que de la misma no surge con claridad el que el
Lcdo. Carlos Franco tratara de sobornar al Lcdo. Hiram
Sánchez Martínez a favor de la Sra. Arvia Ramírez. Enten-
demos que en el contexto de la situación acaecida la manifes-
tación hecha por el Lcdo. Franco no tiene el alcance de una
oferta del aludido abogado". Finaliza su informe exponiendo
que para "llegar a otra conclusión tendríamos que entrar en
consideraciones de tipo objetivo, las cuales no podemos pre-
cisar por su propia naturaleza".

## II

El 24 de mayo concedimos término al licenciado Franco
Soto para que mostrara causa por la cual no debería "ser
disciplinado incluyendo [*sic*] ser separado del ejercicio de la
profesión de abogado". Ha comparecido y resolvemos.

En su escrito, básicamente el letrado Franco Soto rela-
ciona su previo historial profesional y buena reputación,

honestidad, y conducta intachable. Expone y explica la íntima amistad que le une con los progenitores de la aspirante Arvia Ramírez Padró, el Lic. Luis A. Ramírez Irizarry y su esposa Doña Margarita Padró. Acompaña nueve declaraciones juradas de distintas personas de relieve en las comunidades de Yauco y Sabana Grande acreditativas de esa condición moral. Además, presentó declaración jurada del licenciado Ramírez Irizarry, que en lo pertinente reza:

Al momento en que presto esta declaración tengo *83* años; fuí admitido a ejercer la profesión de abogado en 1940; desde entonces tengo Bufete propio excepto por varios años que tuve el honor de ocupar la posición de Juez Municipal, luego designada Juez de Distrito.

Amo mi profesión y recibí una gran alegría cuando mi hij[a] ARVIA RAMIREZ PADRO me comunicó que deseaba estudiar Derecho. Hasta entonces ella había sido maestra de Instrucción Pública y aún ese dato nos vinculaba ya que al momento de pasar la reválida ocupaba yo la plaza de Principal de Escuelas.

Es conocido el hecho de que luego de graduarse mi hija ha confrontado problemas con la reválida lo que nos ha entristecido profundamente a su madre y a mí.

Dentro de esa angustia tanto ella como nosotros hemos tenido la satisfacción de tener el consejo cariñoso, la comprensión y la generosidad de un gran amigo, el Lcdo. CARLOS FRANCO, a quien conocemos desde hace muchísimos años.

Aunque no tengo claro todos los detalles tengo conocimiento de que el Lcdo. CARLOS FRANCO ha tratado de ayudar a mi hija consiguiéndole exámenes anteriores, aconsejándola que visitara la Oficina de la Junta en el Tribunal Supremo y estimulándola para que no se diera por vencida.

El Lcdo. FRANCO y yo hemos hablado en varias ocasiones; a mi se me consigue siempre en mi casa porque en ella tengo mi Bufete. Él viene no únicamente por lo de mi hija sino porque se preocupa por mi salud. Mi salud está delicada y mi médico, el DR. FEDERICO HERNANDEZ MORALES, me ha advertido de que debo sufrir una operación pronto.

En una de esas conversaciones mientras hablábamos sobre mi hija le dije algo que ahora no recuerdo bien pero que parece más o menos fue lo siguiente: "mira Franco: uno quiere

tanto a los hijos que sería capaz de conseguir diez mil pesos para el examen ese".

Este exabrupto fue el producto de mi ansiedad, la desesperación de un momento y la impotencia ante las realidades que hay que aceptar en la vida, en una conversación privada con un amigo. Éste nada comentó y la conversación siguió sin que se le diera mayor importancia al asunto.

Bajo ningún concepto puede interpretarse que pretendía valerme del Lcdo. FRANCO para tan baja encomienda; respeto demasiado al Lcdo. FRANCO para proponerle y me respeto lo suficiente para a mis 83 años manchar mi reputación y la de mi hija para siempre de tal manera.

Estoy seguro, porque lo conozco, que el Lcdo. FRANCO así lo entendió.

Lamento profundamente que a unas palabras del Lcdo. FRANCO sobre este incidente se le haya dado tal importancia y que el asunto haya tomado un giro tal que inclusive ponga en peligro la reputación bien ganada y el título de nuestro querido amigo, Lcdo. FRANCO.

## III

La evaluación ética de la conducta del abogado Franco Soto no depende de que determinemos y precisemos si, desde el prisma del Derecho penal actuó intencionalmente (*mens rea*), y verdaderamente hizo un ofrecimiento de soborno al licenciado Sánchez Martínez. Compartimos la preocupación de dicho funcionario. La seriedad del incidente amerita que sea examinado y medido en toda la extensión de su dimensión ética. Recordemos que un "hecho, considerado desde diversos puntos de vista, puede revestir diversos caracteres de ilicitud. En efecto, de acuerdo con la naturaleza del derecho que se aplique, es civil, penal o administrativamente ilícito. El derecho aplicado es lo que determina que un hecho sea ilícito o no. *La aplicación de las normas profesionales, que exigen en el abogado un nivel de dignidad superior al del común de las gentes, hace ilícita la conducta de éste por la realización de actos que los que no ejercen la profesión del derecho pueden realizar sin mayor desdoro".* (Énfasis su-

plido.) A. E. Parry, *Ética de la Abogacía*, Buenos Aires, Ed. Jur. Argentina, 1940, T. I, pág. 83.

Los signos de los tiempos son difíciles. La tendencia en el mundo contemporáneo es reclamar mayores exigencias de todos los profesionales. La sociedad puertorriqueña no está exenta de ese pedido. Entre esa clase se destaca prominentemente el abogado. Señala con acierto el Dr. Alfredo R. Sívori:

> Frente a un mundo convulsionado y confuso; en momentos en que pareciera adueñarse del alma del hombre, cierto grado de menoscabo por los sentimientos de probidad, de honradez y de dignidad; cuando el avance de la concupiscencia y de la deshonestidad económica, amenaza con quebrar los basamentos del orden social, generando —al par que el deterioro de la fe en los altos valores morales y espirituales— reacciones agresivas y violentas rebeldías en quiénes se sienten marginados, defraudados y acorralados en una sociedad que no los tutela ni los comprende; cuando la necesidad de pan y de trabajo, aparece como una burla en medio de un desarrollo tecnológico poco menos que asombroso; cuando los reclamos más apremiantes están en la calle y el hombre-masa no encuentra posibilidad cierta de remediar su desgracia, el abogado se enfrenta con el desafío que le llama a ser protagonista decisivo y fecundo en este proceso, del que debemos rescatar intacta la fe en el hombre y en su destino de apasionado perseguidor de la justicia. Cualquiera sea el sector en que gravite; el ejercicio activo de su profesión, la cátedra, la política, el libro, la tribuna o el gobierno, tiene un papel tutelar; papel y cometido, que a ninguna otra disciplina alcanza con más hondura que a la abogacía. A. R. Sívori, *Papel del abogado en la sociedad actual*, XVI Rev. C. Abo. La Plata 19–20 (1974).

Ante este panorama, el juez, al igual que el "abogado de hoy debe transitar por el meridiano de su época". Prólogo de Augusto M. Morello en la obra de R. H. Viñas, *Ética y derecho de la abogacía y procuración*, Buenos Aires, Eds. Pannedille, 1972, pág. XVII. No puede permanecer ajeno a las realidades circundantes.

■ El pretender ejercer una influencia —expresa o sutil, real o imaginaria— sobre los órganos administrativos o

judiciales adjudicativos y sus funcionarios, representa un interés apremiante debidamente tutelado por el Estado moderno.

La premisa es sencilla, pero de inconmesurable valor: en un régimen de leyes nadie tiene derecho a un trato preferente y ventajoso basado en el dinero, la ventaja o la mejor relación personal. Nuestra administración pública está cimentada en el fiel desempeño del ejercicio por los funcionarios públicos, sin que para ello medie paga adicional alguna o consideraciones extrañas a los méritos del asunto en cuestión. Así, a modo de ejemplo, nuestro Código Penal, bajo la rúbrica de *Delitos Contra la Función Pública*, tipifica, prohíbe y penaliza en sus variadas manifestaciones distintas formas de conducta indebida. Arts. 200–215 (33 L.P.R.A. secs. 4351–4366). Su Art. 212 en interacción con el Art. 210 castiga a "[t]oda persona que directamente o por persona intermedia[ria] diere o prometiere a un funcionario . . . público "dinero, o el beneficio . . . por ejecutar un acto contrario al cumplimiento regular de sus deberes". 33 L.P.R.A. secs. 4362 y 4361.

En resumen, la oferta de soborno reviste distintas formas. Unas directas y otras sutiles. Algunas más y otras menos inteligentes.

### IV

■ A los fines de disponer este asunto hemos de coincidir con el Procurador General y presumir que el licenciado Franco Soto efectiva e intencionalmente no comunicó una oferta de soborno. Los hechos no son punibles desde la perspectiva penal. Sin embargo ello no le releva de responsabilidad profesional en el ámbito ético y disciplinario.

El preámbulo del Código de Ética Profesional "exige al abogado . . . que esté consciente de la importancia de evitar aun la apariencia de conducta impropia". 99 D.P.R. 1002 (1970).

Ciertamente, acudir a la Junta de Aspirantes al Ejercicio

de la Abogacía, y casualmente informar y hacerle saber a su Director que determinada persona ha manifestado que está dispuesta a pagar $10,000 por un examen de reválida —independientemente de la intención criminosa o no— constituye una conducta altamente reprobable y contraria a los mejores postulados de la ética profesional. Una buena administración pública y el compromiso de todo abogado de luchar por la justicia y la verdad, repele ese comportamiento aun cuando su ropaje sea inocente.

El delicado desempeño de las funciones de su cargo relacionadas con la certificación de competencia y acreditación de los abogados, en sus distintas fases, no debe ser sobrecargado y gravado con diálogos o comunicaciones escritas de este género. En el diario quehacer administrativo y adjudicativo es menester que protejamos a los funcionarios de la Rama Judicial y demás miembros de la Junta Examinadora de incidentes análogos.

En lo concerniente a dicha Junta toda gestión en beneficio de un aspirante, directa o por intermediario, debe ceñirse a los trámites dispuestos en su Reglamento. En lo pertinente, una lectura de las Reglas 10(b) y 16([1]) refleja una prohibición de comunicaciones con los miembros de la Junta. Su violación no sólo puede conllevar una descalificación del aspirante en casos apropiados, sino la adopción de medidas disciplinarias contra el abogado que las infrinja. Debemos encaminarnos "a destruir ese concepto erróneo de que los abogados podemos prestarnos, sin tener una íntima convic-

---

([1])(b) .    .    .    .    .    .    .

"Ningún aspirante se comunicará directamente con los miembros de la Junta respecto a su actuación en el examen o a cualquier otro asunto relacionado." T.4 Ap. VII-B, R. 10(b).

Salvo según el procedimiento establecido en la Regla 10, "[n]ingún aspirante podrá comunicarse directamente [o] a través de terceras personas con los miembros de la Junta respecto a cualquier asunto relacionado con la preparación, contenido, administración, corrección y evaluación de los exámenes de reválida y sus contestaciones. Cualquier infracción conllevará la denegación de la solicitud de examen o la descalificación del aspirante en caso de que hubiere sido admitido a examen". T.4 Ap. VII-B, R. 16.

ción sobre su verdad y justicia, a defender la causa que nos propongan. 'Si la abogacía fuera eso —protesta indignado Ossorio— no habría menester que pudiese igualarla en vileza. Incendiar, falsificar, robar y asesinar serían pecadillos veniales si se les comparaba con aquel encanallamiento; la prostitución pública resultaría sublimada en el parangón, pues al cabo, la mujer que vende su cuerpo puede ampararse en la protesta de su alma, mientras que el abogado vendería el alma para nutrir el cuerpo.' (El Alma de la Toga)". R. De Sola, *Nuestra Profesión de Abogados*, 131 Rev. C. Abo. Dist. Fed. 87, 99–100 (1966).

■ En las circunstancias expuestas, concluimos que el licenciado Franco desplegó un juicio poco prudente y profesional. Al así hacerlo incurrió en una grave infracción ética al comunicar, aunque fuera producto de un exabrupto temporal del licenciado Ramírez Irizarry, el sentir y la aptitud de "que sería capaz de conseguir diez mil pesos para el examen ese".(2) ¿Qué importancia o relevancia tenía esa infor-

---

(2) Esta expresión del licenciado Ramírez Irizarry fue desafortunada. Su admisión mediante declaración jurada no ofrece margen de duda al respecto. El comentario trascendió y rasgó el manto de su intimidad. Ramírez Irizarry ha comparecido intercediendo por el licenciado Franco, reafirmando su expresión —que adviene pública— explicando y reflejando su convicción y penoso estado de ánimo al momento de producirse.

La admisión al ejercicio de la abogacía es asunto delicado, revestido de profundo interés público. Los abogados, a través de sus expresiones, deben ser especialmente cuidadosos de no manchar la pureza del sistema de adjudicación de controversias, inclusive aquel que sirve para evaluar la calidad del conocimiento de los aspirantes al ejercicio de la abogacía. Máxime, cuando puede haber un conflicto de intereses potencial entre su expresión y su realidad concreta —en este caso estaba de por medio una aspirante— que podría desencadenar, si no en una acción penal, en propiciar incidentes análogos al de autos y enojosos trámites disciplinarios.

Nuestra indeclinable función constitucional e inherente de reglamentar la profesión legal no pretende llegar hasta lo más recóndito de la conciencia del abogado y expurgar las instancias de su sacrosanta intimidad y privacidad. Ello no implica que nos crucemos de brazos y pasemos por alto una expresión derogatoria contra la majestuosidad y dignidad que se espera de todo abogado comprometido con la verdad y la justicia. Entendemos el contexto singular y emotivo que la motivó. Pero aun la más profunda tribulación paterna no puede ser excusa para renunciar a los más altos principios que inspiran a la abogacía. Si acaso, en tales momentos, un hombre debe buscar sosiego dentro de sí, expandiendo su ser y espí-

mación para que el licenciado Franco Soto lo comunicara al licenciado Sánchez Martínez?

Su proceder y conducta merecen nuestra más enérgica censura y amonestación. (3) Considerando su previo historial de honradez y de buen profesional, se le suspende del ejercicio de la abogacía, sin menoscabo de que el Tribunal, transcurrido un término razonable, lo reinstale una vez demuestre ser acreedor a ello.

Se publicará este dictamen y unirá copia al expediente personal del licenciado Franco Soto obrante en la Secretaría de este foro.

*Se dictará sentencia de conformidad con lo expuesto.*

---

ritu, exaltando su ministerio, y sirviendo a la justicia. Así encontrará paz y recogimiento a sus tribulaciones.

(3) En justicia, hemos de consignar que no existe la más mínima evidencia de que la aspirante Arvia Ramírez Padró tuviera conocimiento de estos hechos.