EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: Hon. Gilberto Rodríguez Zayas | 2000 TSPR 97 |

Número del Caso: TS-7583

Fecha: 26/junio/2000

Oficina del Procurador General:

Lcda. Yvonne Casanova Pelosi
Procuradora General Auxiliar

Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO**Error! Bookmark not defined.**

In re:

Hon Gilberto Rodríguez          7583
Zayas

RESOLUCIÓN

San Juan, Puerto Rico, a 26 de junio de 2000

El 19 de octubre de 1993, la directora Administrativa de los Tribunales, Hon. Mercedes M. de Bauermeister, sometió un informe de Investigación a la Comisión Disciplinaria y de Separación del Servicio por Razón de Salud de Jueces del Tribunal de Primera instancia y del Tribunal de Circuito de Apelaciones ("la Comisión") respecto a la conducta observada por el entonces Juez de Distrito, Lcdo. Gilberto Rodríguez Zayas, imputándosele a éste sendas violaciones a los Cánones I, X, y XVI de Ética Judicial, así como a otras disposiciones estatutarias y reglamentarias aplicables a las actuaciones de los Jueces de Puerto Rico. En el mencionado informe se describió la conducta del Juez querellado del siguiente modo:

"1. El Hon. Gilberto Rodríguez Zayas comenzó a desempeñarse como Juez Municipal para el año 1986. En la actualidad se desempeña como Juez de Distrito en el Tribunal de Ponce.

2. El día 17 de marzo de 1993, alrededor de las 2:00 p.m., el Sr. Jorge Salvá Malaret acudió al Centro Judicial de Ponce, en compañía de su novia Angélica María Costa Madera y el Sr. José René

Rivera Medina, con el propósito de solicitar información para contraer matrimonio.

3.    Estando en el primer piso del Tribunal lo enviaron al cuarto piso, específicamente a la oficina del Juez Rodríguez Zayas.

4.    Al entrar a la oficina del Juez Rodríguez, los jóvenes Salvá-Costas se percataron que había otra pareja que estaba siendo atendida por la secretaria del Juez, Sra. Neyda Rivera Febles.    Ellos eran los jóvenes Maricelia Figueroa Bonilla y Gerardo Rodríguez Collazo.

5.    La Sra. Neyda Rivera Febles, informó a ambas parejas cuál era el procedimiento preliminar para poder contraer matrimonio. Les indicó que tenían que tener el certificado de matrimonio, la certificación médica, la licencia para contraer matrimonio y una cantidad de cincuenta ($50.00).

6.    Como ambas parejas tenían todos los documentos necesarios para contraer matrimonio y, en vista de que ninguno de ellos tenía los dos testigos que necesitaban, decidieron servirse de testigos unos a otros para poder celebrar el acto de matrimonio.

7.    Una vez acordado por los contrayentes, la secretaria del juez comenzó a llenarles el certificado de matrimonio con la información que los jóvenes le iban proveyendo.

8.    El juez no se encontraba en su oficina en ese momento y, no fue sino hasta alrededor de las tres de la tarde que llegó.

9.    Al llegar el juez, su secretaria entró a la oficina y, al salir, les dijo a los jóvenes que el juez los iba a casar y que podían entrar.

10.    Antes de que los jóvenes Salvá-Costa y Rodríguez-Figueroa entraran a la oficina del juez, la secretaria les dio a cada uno un sobre para que echaran los $50.00 por la celebración del acto del matrimonio.

11.    Estando los jóvenes dentro de la oficina del juez, éste le dijo al señor Rivera Medina, amigo del señor Salvá, que podía entrar también y participar de la ceremonia.

12.    El Juez Rodríguez Zayas realizó el acto del matrimonio, alrededor de las 3:00 p.m., declarando marido y mujer a ambas parejas.

13.    Ambas parejas procedieron a firmar el Certificado de Matrimonio y la certificación de la celebración del matrimonio.

14.    Una vez finalizado el acto, el señor Salvá le preguntó al juez, antes de salir, que a quién debía entregarle el sobre con dinero, el juez le pidió que se lo entregara a su secretaria.

15.    El señor Salvá le entregó el sobre a la secretaria el juez y, le solicitó a ésta que le diera un recibo que especificara la cantidad entregada, el concepto por el cual se entregaba el dinero, además de la fecha <u>y la hora</u>.

16.    La secretaria le manifestó al señor Salvá que esa decisión la tomaba el juez y que debía hablar con este último.

17. El señor Salvá entró nuevamente a la oficina del juez con la intención de pedirle el recibo. El juez se negó a dárselo porque no era necesario.

18. Ante la insistencia del señor Salvá, el juez Rodríguez Zayas accedió a darle el recibo.

19. El señor Salvá le informó a la secretaria del juez que éste había accedido a darle el recibo.

20. La Sra. Neyda Rivera entró a la oficina del juez y al salir preparó el recibo, sin especificar la hora. Finalmente, el juez lo firmó.

21. El señor Salvá volvió a solicitar el recibo con las indicaciones antes señaladas pero la secretaria se negó a ello.

22. El señor Salvá habló nuevamente con el juez pero éste se negó a preparar el recibo incluyendo la hora, según le era solicitado, alegando que no era necesario hacerlo de esa manera.

23. Al ver que no puede hacer nada en relación con el recibo, el señor Salvá fue al primer piso del Centro Judicial de Ponce a solicitar ayuda para obtener el mismo, toda vez que él quería justificar su ausencia en su trabajo.

24. La persona que lo atendió en el primer piso llamo a la oficina del juez y habló con la secretaria de éste. Le pidieron que subiera nuevamente a la oficina del juez.

25. Al llegar a la oficina del juez Rodríguez, el señor Salvá pidió el recibo a la Sra. Neyda Rivera y ésta le informó que ya se lo habían entregado.

26. El señor Salvá bajó nuevamente al primer piso y esta vez habló con "la Directora", quien llamó a la oficina del juez Rodríguez y le pidió que subiera nuevamente.

27. El señor Salvá entró por tercera vez a la oficina del Juez Rodríguez a buscar el recibo. La secretaria del juez le pidió que esperara unos minutos en lo que el juez llegaba ya que había salido.

28. Al llegar el juez, el señor Salvá le informó que le habían pedido que subiera a buscar el recibo. El juez le manifestó que él no tenía que darle ningún recibo y que ya le había dado el que le iba a dar.

29. Se encontraban presentes: Angélica Costa Madera y José Rivera Medina.

30. El Juez Rodríguez le pidió al señor Salvá que saliera de su oficina ya que, de lo contrario llamaría a un guardia. El Juez Rodríguez salió de su oficina sumamente alterado y botó al señor Salvá diciéndole: "no me molestes más, no me haga perder el tiempo, te me largas, te me vas, y él le abrió la puerta, y entonces le dijo a Jorge, "mira si tu no quieres que yo llame a un alguacil te me vas, te me largas, no me moleste más. Yo me quedé como que ... yo me salí de allí...".

31. Eran alrededor de las cuatro a cuatro y treinta de la tarde.

32. El señor Salvá llegó hasta el sexto piso a pedir ayuda. Allí habló con el Alguacil Efraín Torres Mercado, quien se encontraba en el monitor y le explicó su problema.

33. El Alguacil Torres trató de ayudar al señor Salvá y le pidió que bajara nuevamente al cuarto piso ya que lo iban a atender.

34. La Sra. Neyda Rivera llamó al Alguacil José Crespo Nazario, del cuarto piso, y le entregó a éste un sobre manila, pidiéndole, a su vez, que se lo entregara al señor Salva cuando éste regresara; no sin antes pedirle el original de un papel (recibo) que el señor Salvá tenía.

35. Cuando el señor Salvá llegó al cuarto piso, el Alguacil Crespo le entregó un sobre manila con el timbrado del Tribunal; y le pidió a su vez, el recibo que el Juez Rodríguez Zayas le había entregado.

36. Antes de entregarle el recibo al alguacil Crespo, el señor Salvá le sacó una copia al mismo.

37. El Alguacil Crespo recuerda que el papel que le entregó el señor Salvá era uno "común y corriente de cartas" y que pudo ver que decía "Recibo" en letras grandes.

38. Antes de que el Alguacil Crespo le entregara el sobre al señor Salvá, ambos fueron a la oficina del juez.

39. El alguacil corroboró que el papel entregado por el señor Salvá fuera el correcto y la Sra. Neyda Rivera contestó en la afirmativa. Le entregaron el recibo a la señora Rivera y el sobre manila al señor Salvá.

40. Cuando el señor Salvá abrió el sobre se percató que le estaban entregando los documentos que él había traído para poder contraer matrimonio, incluyendo la certificación médica, pero, "el Certificado de Matrimonio estaba en blanco", no era el que él había firmado ni el que había traído del Registro Demográfico. En el sobre también le incluyeron los $50.00 que había pagado con el propósito de contraer matrimonio.

41. La Sra. Neyda Rivera le dijo al señor Salvá que hablara con el Juez Rodríguez Zayas.

42. El Juez Rodríguez permitió al señor Salvá y al Alguacil Crespo que entraran a su oficina.

43. El señor Salvá le preguntó al Juez Rodríguez por los documentos que él había traído, que tanto él, su novia y los testigos habían firmado. El juez le firmó que ese documento lo habían roto y echado al zafacón.

44. El Alguacil Crespo describió detalladamente la conversación sostenida por el juez y el señor Salvá expresando lo siguiente:

> "El joven le indica al juez respetuosamente, según mi mejor recuerdo, le explica que él había llenado unos papeles, y que él había firmado y que él había estado

casado porque el juez había firmado. El juez le indica que él no había estado casado, él fue testigo de haber firmado, no sé, que había sido testigo pero que esos papeles no eran válidos, no obstante hayan llegado al Registro Demográfico y entonces él le dice que estaba muy bien pero que él quería una copia de ese papel, el juez le dice que no, que esos papeles él los había botado porque él no los iba a casar, le dí unos papeles en blanco nuevos para que usted busque otro juez para que los case. Y él dice, no hay problema en yo buscar otro juez para que me case, lo que yo quiero es una copia de ese papel y no me puedo ir de aquí con una copia de ese papel porque ahí está mi firma. Así estuvieron varios minutos ... Así estuvieron hasta que el juez le dice que esos papeles ya no existían porque él los había botado, él los había roto, los había destruído porque él no los había casado, que él firmó pero que eso fue algo que, la firma y no lo había casado porque no obstante hasta que llegue al Registro Demográfico eso no es válido. Y él le dice que dónde podría conseguir esos papeles, y le dice, pues el señor de la basura vino y se los llevó, y el joven le indica que dónde puede conseguir esos papeles o al señor que se llevó la basura, y le dice, yo no sé porque ya él se los llevó para abajo y ya botó los papeles abajo; ya él botó la basura que recogió del piso y está abajo; el joven indica que en qué parte de abajo puede encontrar los papeles y le dice, pues, donde se ubica toda la basura del Tribunal, allí puede irlos a buscar, si los encuentra, si tiene ... El joven al decirle que están donde está toda la basura del Tribunal, pues cedió y le dijo que estaba muy bien, que muchas gracias y salió conmigo, yo le abría puerta y salimos los dos ...″

45. El señor Salvá señaló lo siguiente:

"...Me quedé sin palabra alguna, me quedé totalmente mudo y no encontraba que decir, lo único que le dije, que lo que podía hacer era irme. Le dije, señor juez, no tengo nada que decirle, con un nudo en mi garganta, porque así fue, gracias. Salí de ahí y fui al sexto piso..."

46. Antes de subir al sexto piso el señor Salvá le preguntó al Alguacil Crespo si se cobraba por la celebración de bodas en horas laborables. El alguacil le respondió en la negativa.

47. El Alguacil Crespo declaró que luego de que el señor Salvá se marchó, regresó al cuarto piso debido a que el Alguacil Alfonso de León le iba a preparar una comparecencia. En esos momentos llegó el Alguacil Alfonso de León, cogió un papel de maquinilla en blanco y le hizo una comparecencia como que estuvo en el Tribunal, por motivo de unas boda y lo firmó. El señor Salvá cogió el papel y se fue.

48. Dicha comparecencia lee de la siguiente manera:

"17 de marzo de 1993

Hago constar que en el día de hoy compareció el Sr. Jorge Salvá al Tribunal de Ponce, Sala 403 con el propósito de contraer matrimonio ante el juez Gilberto Rodríguez Zayas. Que salió del Tribunal a las 3:10 P.M. en este día.

Así lo certifico y doy fe de ello en Ponce, P.R. (firmado) Alfonso León, Alguacil."

49. Finalmente, la Sra. Carmen Ivette Méndez Ortiz, Directora Ejecutiva del Centro Judicial de Ponce, atendió al señor Salvá, a su novia y su amigo, José R. Rivera Medina, quienes le contaron en detalle lo ocurrido. La señora Méndez retuvo copia de los documentos que le enseñó el señor Salvá.

50. La señora Méndez Ortiz le preparó dos certificaciones al señor Salvá, una dirigida al Sr. Pedro Morales, gerente del Restaurant Grandy's de Ponce y otra a la Administración de Veteranos de Ponce, donde certificadas que el Sr. Jorge Salvá había estado presente en el Centro Judicial de Ponce desde las 2:00 hasta las 6:00 de la tarde.

51. La Sra. Carmen I. Méndez preparó un informe del incidente ocurrido el día 17 de marzo del corriente, con respecto a las bodas celebradas por el Hon. Gilberto Rodríguez Zayas. Dicho informe fue referido por el Hon. Miguel A. Montalvo Rosario, Juez Administrador Regional de Ponce, a la Lcda Mercedes M. Bauermeister, Directora Administrativa de los Tribunales, para la investigación correspondiente.

52. De conformidad con la versión prestada por el Sr. Jorge Salvá Malaret, éste asegura que el día 17 de marzo había llegado al Tribunal alrededor de las dos de la tarde y el juez Rodríguez Zayas había comenzado con la celebración del matrimonio como a las tres de la tarde.

53. La Srta. Angélica María Costas Madera coincide con la versión de su novio al asegurar que llegó al Centro Judicial de Ponce en compañía de Jorge Salvá y un amigo de éste, José Rivera, alrededor de las 2:00 ó 2:15 p.m.

54. El Alguacil José Crespo Nazario asegura haber visto por última vez, a los jóvenes Salvá-Costa, antes de las 5:00 p.m.

55. El día 28 de mayo de 1993, el Sr. Jorge Salvá Malaret prestó una segunda declaración ante el Lcdo. Nelson J. Canabal Pérez, en las facilidades del Centro Judicial de Ponce.

56. El señor Salvá se había comunicado, vía telefónica, con el licenciado Canabal Pérez en relación a un nuevo incidente ocurrido entre él y el Juez Rodríguez Zayas el día 17 de mayo del corriente, alrededor de las 12:30 de la tarde.

57. Ese día, mientras se encontraba el señor Salvá en su trabajo, Restaurante Grandy's de Ponce, se presentó el Juez Rodríguez Zayas con el propósito de dialogar con él lo referente a la queja que se estaba investigando sobre su persona.

58. El señor Salvá señaló que el Juez Rodríguez había ido a disculparse por el incidente ocurrido el día 17 de marzo de '93.

59. El señor Salvá expresó lo siguiente con respecto a las disculpas ofrecidas por el Juez Rodríguez y a la conversación sostenida:

..."él se disculpa conmigo diciéndome que lamentaba mucho lo que había sucedido, que esto nunca le había sucedido a

él, que a él le gustaba su trabajo y que llevaba siete años en su trabajo, y me dijo además de eso, que le disculpara que aunque había pasado todo esto pues él entendía que fue negligencia de él, recuerdo también que él me dijo que, al momento de nosotros estar hablando, de qué forma, o sea, él a lo que llegó a Grandy's fue a decirme a mí que de qué forma podíamos arreglar esto lo más breve posible para que esto no se siguiera extendiendo porque él entendía que le iban a hacer una investigación administrativa y que esto le iba a causar problemas. Yo a todo esto escuchándolo aún todavía, no me había llegado todavía la oportunidad de poder hablar, permitiéndole a él que hablara, viene y me dice, Salvá, tu sabes que la calle está dura, que no se consigue trabajo, no sé si sabes que lo más probable me hagan una investigación, no sé como salga de ella, yo necesito la más pronta atención tuya, qué podemos hacer, que tu me digas a mi de alguna otra forma que podamos resolver esto lo antes posible y que lleguemos a un acuerdo de alguna forma...".

...me dijo, necesito que me des una oportunidad, pero antes de todo esto él se está disculpando conmigo, me dice, Salvá uno siempre tiene momentos en la vida, nunca me había pasado esto, a mí me gusta mi trabajo, me gusta lo que hago, necesito que tu me des la oportunidad, uno tiene contratiempos en la vida, pero ésta no fue mi intención. Recuerdo también que me dijo de qué forma nos podíamos comunicar y yo le dije que la única comunicación que podía tener conmigo era en mi trabajo ..."

60. El señor Salvá señala que le dijo al juez lo siguiente:

..."Señor juez, yo quiero que usted me sea honesto, que me diga a mí a qué hora, usted sabe a la hora que usted me casó, y él hizo una pausa pensando y me dijo, honestamente me dijo, fue de tres y cuarto de la tarde, y yo le contesté, usted sabe que fue verdad..."

61. El Juez Rodríguez Zayas interesaba comunicarse nuevamente con el señor Salvá para que éste le informara lo que había decidido respecto a su petición. Por tal motivo, le anotó en una servilleta el número de teléfono de su residencia y el del Tribunal.

62. El señor Salvá describió la actitud del Juez Rodríguez Zayas, cuando éste acudió a su trabajo, de la siguiente manera:

..."Estaba en una actitud pacífica, tranquila, pero se mostraba dentro de él y físicamente que, primeramente tenía los ojos llorosos, colorados era una actitud, cómo diría, pidiéndome ayuda, pidiéndome ayuda por que me pidió perdón, me pidió que de favor llegáramos a un acuerdo que pudiéramos resolver esto antes de más allá..."

63. En el transcurso de la investigación que realizaba la Oficina de Asuntos Legales de la Administración de los Tribunales, con respecto a la conducta del Juez Rodríguez Zayas, se le tomaron declaraciones juradas a los jóvenes Gerardo Rodríguez Collazo y Maricelia Figueroa Bonilla.

64. Estas pareja, Rodríguez-Figueroa, también contrajo matrimonio el día 17 de marzo de 1993, a la misma hora en que alegadamente se efectuó la boda de los jóvenes Salvá-Costa.

Ambas parejas se casaron y se sirvieron de testigos unos a otros.

65. El matrimonio se efectuó en las facilidades del Centro Judicial de Ponce, en horas laborables.

66. También se le cobraron $50.00 a los jóvenes Rodríguez Figueroa por oficiar la boda.

67. El día 20 de julio de 1993, la Lcda. Lissette Domench, Asesora Legal de la Oficina de Asuntos Legales de la Administración de los Tribunales, le notificó una nueva queja al Hon. Gilberto Rodríguez Zayas por haber realizado otro matrimonio en horas laborables y cobrarle a los jóvenes la cantidad de $50.00.

68. Cuando los jóvenes Rodríguez-Figueroa entregaron el sobre con los $50.00, en efectivo, no pidieron recibo por el dinero entregado. La señora Figueroa señaló:

"...como ella (refiriéndose a la secretaria del juez) no quería dar recibo pues nosotros nos fuimos y entonces ellos se quedaron..."

69. La Sra. Maricelia Figueroa declaró que el juez Rodríguez Zayas había celebrado el matrimonio alrededor de las tres de la tarde.

70. Por su parte, el joven Gerardo Rodríguez asegura haber llegado al Centro Judicial de Ponce entre dos a tres de la tarde, y que el juez llegó a su oficina casi media hora después de ellos estar esperándolo. Asegura que "todo eso ocurrió como de dos a tres y media o tres y cuarto".

El 30 de octubre de 1993, la Comisión determinó la existencia de causa probable en contra del mencionado magistrado, de conformidad con la Regla 13 de Procedimiento de dicha Comisión, y refirió el caso al Hon Procurador General de Puerto Rico para la formulación de la correspondiente querella. Como consecuencia de dicha actuación, el señor Procurador General refirió el asunto a la División de Investigaciones y Procesamiento Criminal del Departamento de Justicia a los fines de que se determinara la procedencia de cargos criminales en contra del Juez Rodríguez Zayas; solicitó a su vez la paralización de los procedimientos disciplinarios ante la Comisión hasta tanto se completara el trámite que se llevaba a cabo en la referida División y se llegara a una determinación final como resultado del mismo. A ello accedió la Comisión.

El 8 de julio de 1994, un Fiscal Especial Independiente inició un proceso criminal en contra del mencionado juez, el cual culminó en sendos veredictos de culpabilidad en contra de éste, después de un juicio por jurado en la subsección de Ponce del Tribunal de Primera Instancia, por los delitos de infracción al Art. 205 del Código Penal (retención y destrucción de documentos públicos) y ocho (8) infracciones al Art. 209 de dicho Código (soborno) en su modalidad de haber exigido el pago y cobrado dinero para realizar un acto regular de su cargo (celebración de matrimonios durante las horas laborables de dicho magistrado).

En la misma fecha en que fuera sentenciado por tales delitos, 30 de mayo de 1995, el abogado Rodríguez Zayas renunció a su cargo de Juez de Distrito. En esa misma fecha el Gobernador de Puerto Rico, Hon. Pedro Rosselló González, procedió a indultar al querellado de todos los delitos por los cuales resultó convicto. A base de ello, las sentencias dictadas

quedaron sin efecto por lo que nunca se convirtieron en firmes al no tener dicho abogado oportunidad de apelar de las mismas.

Simultáneamente con el proceso criminal, el Procurador General presentó ante la Comisión una querella en contra del mencionado Juez cuando todavía ocupaba dicho cargo, imputando a éste trece (13) violaciones de los Cánones de Ética Judicial; violación del Reglamento del Sistema de Personal de la Rama Judicial; violación al Art. 81 del Código Civil, 31 L.P.R.A. sec. 249; y violación a las secciones 892 (a) y 894 del Título 4 de las Leyes de Puerto Rico Anotadas. A petición de las partes en dicho procedimiento administrativo, el mismo quedó paralizado pendiente a los resultados de la acción penal en contra del querellado.

Así las cosas, con fecha de 14 de marzo de 1996, la Comisión sometió a la consideración de este Foro un escrito titulado "Moción Informativa en Cumplimiento de Orden" en el cual nos informa lo siguiente:

> "24) La Comisión de Disciplina y de Separación del Servicio por Razón de Salud de Jueces del Tribunal de Primera Instancia y del Tribunal de Circuito de Apelaciones, fue notificada el 27 de diciembre de 1995, durante su vigésimoséptima reunión general que el Procurador General de Puerto Rico había radicado una solicitud de desaforo contra el Lic. Gilberto Rodríguez Zayas, como abogado, por la convicción de delitos graves y otros. Se informó a la Comisión que la querella había sido radicada el 11 de diciembre de 1995, y que se había unido al expediente del abogado para ser sometido al Pleno en fecha futura.
>
> Ante esta situación, fue acuerdo de la Comisión paralizar los procedimientos, en relación con esta querella, hasta tanto el Tribunal Supremo emita una resolución en relación con la querella presentada por el Procurador General solicitando el desaforo del querellado por haber sido convicto de delitos graves que conllevan depravación moral."

La Sección 9 de la Ley de 11 de marzo de 1909, 4 L.P.R.A., Sec., 735, dispone lo siguiente:

> "El abogado que fuere culpable de engaño, conducta inmoral (malpractice), delito grave (felony) o delito menos grave (misdemeanor), en conexión con el ejercicio de su profesión o que fuere culpable de cualquier delito que implicare depravación moral, podrá ser suspendido o destituido de su profesión por la Corte Suprema de Puerto Rico. La persona que siendo abogado fuere convicta de un delito grave cometido en conexión con la práctica de su profesión o que implique depravación moral, cesará convicta que fuera, de ser abogado o de ser competente para la práctica de su profesión. A la presentación de una copia certificada de la sentencia dictada a la Corte Suprema, el nombre de la persona convicta será borrado, por orden de la Corte, del registro de abogados. <u>Al ser revocada dicha sentencia, o mediante el perdón del Presidente de los Estados Unidos o del Gobernador de Puerto Rico, la Corte Suprema estará facultada para dejar sin efecto o modificar la orden de suspensión</u>". (Subrayado nuestro.)

Debe de quedar claro que el indulto concedido por el señor Gobernador en este caso no priva a este Tribunal de su jurisdicción disciplinaria sobre el licenciado Rodríguez Zayas. Tampoco su renuncia al cargo de Juez de Distrito nos privó de dicha facultad. No obstante, a pesar de estar conscientes de las graves faltas imputadas a dicho abogado

en los dos procedimientos disciplinarios iniciados en su contra, actuaciones en las cuales incurrió en sus funciones como Juez de Distrito a cuyo cargo ha renunciado; y considerando además, la circunstancia especifica de que las sentencias dictadas en su contra nunca se convirtieron en firmes por resultar académico apelar de las mismas en virtud del indulto de que fuera objeto el querellado por parte del señor Gobernador; y por entender que se cumplen mejor los objetivos rehabilitadores perseguidos por el referido indulto, otorgando de este modo nuestra deferencia a la autoridad constitucional del Gobernador de Puerto Rico, quien concediera dicho perdón después de considerar todos los factores presentes en el caso de marras, se declina el ejercicio de nuestra jurisdicción disciplinaria en este asunto.

En vista de ello, se decreta la desestimación y archivo de la querella presentada.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García disiente con opinión escrita. La Juez Asociada señora Naveira de Rodón no intervino.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO**Error! Bookmark not defined.**

In re:

Gilberto Rodríguez          7583          Conducta
Zayas                                      Profesional

Opinión Disidente del Juez Asociado señor Negrón García

San Juan, Puerto Rico, a 26 de junio de 2000

El delito de **soborno** atenta contra "la moral y los valores fundamentales de la administración pública puertorriqueña" Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 755 (1985). "Nuestra administra-ción pública esta cimentada en el fiel desempeño del ejercicio por los funcionarios públicos, sin que para ello medie paga adicional alguna o consideraciones extrañas a los méritos del asunto en cuestión". In re: Franco Soto, 115 D.P.R. 740, 752 (1984).

El resquebrajamiento en la confianza ciudadana es mayor, cuando el autor del **soborno**, o del delito grave, o cualquiera que implique **depravación moral**, es un **abogado** que actúa como **juez, fiscal, legislador, o funcionario público.**

No importa el papel que el abogado desempeñe, estamos llamados en todo momento a dar el ejemplo para fomentar la fe del pueblo en sus instituciones públicas. **Jamás el soborno, la corrupción, la venalidad o el favor deberán penetrar y hacer nido en los recintos judiciales.**

I

Gilberto Rodríguez Zayas, mientras era Juez del Tribunal de Primera Instancia,[1] fue acusado, convicto por jurado y sentenciado a cárcel por ocho (8) cargos de **soborno** y, uno (1) por **destruir documentos públicos.** Arts. 209 y 205, **Código Penal**, respectivamente. (33 L.P.R.A. secs. 4360 y 4356).

El mismo día en que fue sentenciado, 30 de mayo de 1995, Rodríguez Zayas recibió un **indulto condicionado** del Gobernador, Hon. Pedro Rosselló González. Al **aceptar** el indulto, Rodríguez Zayas, por propia decisión convirtió en académica su apelación contra la convicción.

Posteriormente, el Procurador General presentó la querella que nos ocupa y solicitó su separación indefinida del ejercicio de la profesión. Basó su solicitud en la Sec. 9 de la Ley de 11 de marzo de 1909, que reza:

> "El abogado que fuere culpable de engaño, conducta inmoral (mal-practice), delito grave (felony) o delito menos grave (misdemeanor), en conexión con el ejercicio de su profesión o que fuere culpable de cualquier delito que implicare depravación moral, podrá ser suspendido o destituido de su profesión por la Corte Suprema de Puerto Rico. **La persona que siendo abogado fuere convicta de un delito grave cometido en conexión con la práctica de su profesión o que implique depravación moral, cesará convicta que fuere, de ser abogado o de ser competente para la práctica de su profesión. A la presentación de una copia certificada de la sentencia dictada a la Corte Suprema, el nombre de la persona convicta será borrado, por orden de la Corte, del registro de abogados.** Al ser revocada dicta sentencia, o mediante el perdón del Presidente de los Estados Unidos o del Gobernador de Puerto Rico, la Corte Suprema **estará facultada para dejar sin efecto o modificar la orden de suspensión.**" 4 L.P.R.A. sec. 735 (Énfasis suplido).

Nos preocupa que la mayoría del Tribunal, ordene el archivo de esta querella.

II

El dictamen mayoritario, ¿significa que un indulto **condicionado** del Gobernador o del Presidente de los Estados Unidos, **nos priva de ejercer**

nuestra jurisdicción original disciplinaria? ¿Representa una **claudicación** de nuestro poder **inherente y exclusivo** de reglamentar la conducta ética de los abogados? ¿Constituye una **revocación** de la norma establecida en In re: Casablanca, 30 D.P.R. 399 (1922), a los efectos de que un indulto **no borra los actos** por los cuales fue convicto el abogado? ¿Es una **enmienda** al requisito profesional sobre **buena conducta moral y reputación**, 4 L.P.R.A. sec. 721?

¿Implica que los delitos graves y actos delictivos cometidos por un juez, **impide su ulterior sanción disciplinaria como abogado**, luego de su renuncia a la magistratura? La Comisión Disciplinaria y de Separación del Servicio por Razón de Salud de Jueces del Tribunal de Primera Instancia y del Tribunal de Circuito de Apelaciones, ¿cómo interpretará o que efecto jurídico dará a esta Resolución en cuanto a la querella PAD-93-08 que allí pende contra Rodríguez Zayas? ¿Significa ello, que cuando el Lcdo. Rodríguez Zayas se quitó la toga judicial quedó **inmune**?

**¿No es éste un peligroso precedente judicial aplicable a querellas similares que al presente están pendientes ante este Tribunal contra abogados convictos, algunos de los cuales ocuparon cargos legislativos?**

Si medimos con la **misma vara de la justicia**; ¿cómo compara el dictamen mayoritario de hoy, con lo resuelto en innumerables querellas en que hemos suspendido a muchísimos abogados convictos por delitos graves o que impliquen depravación moral?[2] En resumen, en materia de la ética, ¿qué

---

[1] Admitido al ejercicio de la abogacía el 30 de noviembre de 1982.

[2] En In re: Hernández Pérez, res. el 30 de junio de 1995, 138 D.P.R. _____ (1995) separamos **permanente** al abogado convicto por la Corte Federal de intentar importar sustancia controlada; In re: Albizu Merced, 136 D.P.R. 126 (1994) e In re: Serrano Mangual, 135 D.P.R. 571 (1994) suspendimos **indefinidamente** a los abogados que no respondían a los requerimientos de este Tribunal; Colegio de Abogados v. Bello Hernández, 134 D.P.R. 997 (1993) suspensión **indefinida** por no notificar al Secretario de un cambio en la dirección postal y dejar de pagar la fianza notarial; In re: Rojas Jiménez, 134 D.P.R. 732 (1993) separación **indefinida** por **convicción** al recibir bienes apropiados ilegalmente, falsificar documentos y alterar y remover el número de serie de manufactura de un vehículo; In re: Medina Lugo, 134 D.P.R. 373 (1993) **separación inmediata** de un abogado convicto de endosar falsamente un cheque federal; In re: Farinacci García, 133 D.P.R. 206 (1993) **suspensión** de abogado convicto de transportar al extranjero dinero robado y conspiración; In re: Bonilla, 132 D.P.R. 1038 (1993) **separación permanente** de abogado convicto por conspiración y posesión con intención de distribuir sustancias controladas; In re: Bobet

mensaje estamos comunicando a la judicatura, clase profesional de abogados, los profesores y estudiantes de los cursos de Ética en nuestras Escuelas de Derecho y al pueblo

---

Ruiz, 132 D.P.R. 881 (1993) **separación indefinida** de abogado convicto de resistir u obstruir a la autoridad pública; In re: Santiago Casanova, 122 D.P.R. 489 (1988), **separación inmediata** por violar la Ley de Sustancias Controladas; In re: Dalmau Gómez, 122 D.P.R. 360 (1988), **suspensión inmediata** de un abogado convicto de conspirar para cometer delito contra o defraudar al gobierno federal; In re: Ortiz Gilot, 117 D.P.R. 167 (1986), **separación inmediata** de abogados convictos de delito que implican depravación moral, esto es, hacer algo contrario a la justicia, la honradez, los buenos principios o la moral. In re: Rivera Cintrón, 114 D.P.R. 481, 491 (1983), Morales Merced v. Tribunal Superior, 93 D.P.R. 423, 430 (1966); In re: Boscio Monllor, 116 D.P.R. 692 (1985); In re: Núñez López, 115 D.P.R. 702 (1984); In re: Feliciano, 106 D.P.R. 806 (1978); In re: De Castro, 100 D.P.R. 184 (1971).

de Puerto Rico?

III

Ciertamente nos resulta inconcebible que un abogado, convicto de soborno y destrucción de documento público, cuando **realizaba esa conducta delictiva mientras era juez, quede inmune**.

"Aunque el saldo nos duela 'hay profesiones que no compadecen con los 'términos medios', con las 'medias tintas' en su ejercicio;...' F. Soto Nieto, Compromiso de Justicia, Madrid, Ed. Montecorvo (1987), pág. 29. 'La abogacía, dado su carácter de 'profesión de confianza', debe ser más exigente que otras en la reprobación de la simulación, del fraude y de todo acto que tienda a desvirtuar la verdad o a vulnerar la equidad'. Syro Giraldo, Samuel, Ética de la Abogacía, Derecho, Rev. Col. Abogados, Medellín, Colombia, Tomo XVIII, pág. 37." In re: Marrero Luna, res. en 7 de marzo de 1996, 140 D.P.R. _____ (1996) Voto Disidente, Juez Asociado señor Negrón García.

**Estamos ante un trágico y lamentable precedente.** "Cada falta de un funcionario de justicia es una herida al sistema, y **avanza como onda concéntrica** para lesionar el buen nombre y prestigio de la institución." In re: Feliciano, supra, 809.



ANTONIO S. NEGRÓN GARCÍA
Juez Asociado