EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>    Félix Caratini Alvarado | Querella<br><br>2001 TSPR 46 |

Número del Caso: CP-1990-791

Fecha: 9/marzo/2001

Oficina del Procurador General:

                         Lcda. Yvonne Casanova Pelosi
                         Procuradora General Auxiliar

Abogado de la Parte Querellada:

                         Lcdo. Raúl Aponte Sánchez

Materia: Conducta Profesional

        Este documento constituye un documento oficial del Tribunal Supremo que está
sujeto a los cambios y correcciones del proceso de compilación y publicación
oficial de las decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Félix Caratini Alvarado

CP-1990-791

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a  9 de marzo de 2001

El 3 de octubre de 1986, el entonces Presidente del Banco de la Vivienda, Sr. José A. Rivera, solicitó al Departamento de Justicia una investigación en torno al subsidio de vivienda otorgado a la Sra. Carmen H. Deyó Ferrer; denunció que ella había suministrado información falsa para cualificar para dicho subsidio.

La investigación reveló que el abogado notario Félix Caratini Alvarado preparó y autenticó dos (2) affidávits en los cuales la Sra. Deyó Ferrer __afirmó falsamente__ ser madre soltera, que no recibía ayuda del padre de sus dos (2) hijos y que residía con ellos en casa de su padre (abuelo).  Al declarar ser

jefe de familia, la Sra. Deyó Ferrer fraudulentamente "cumplió" con el requisito legal para obtener subsidio para la compra de una vivienda al amparo de las disposiciones de la Ley Núm. 141 del 14 de junio de 1980[1]. El notario Caratini Alvarado preparó los affidávits en su oficina y en ambos dio fe de conocer personalmente a la Sra. Carmen H. Deyó Ferrer.

El 6 de junio de 1989, el Departamento de Justicia acusó al Lcdo. Caratini Alvarado del delito grave de perjurio ya que alegadamente "preparó y juramentó una declaración falsa sobre hechos esenciales con conocimiento de la falsedad de lo declarado". El 3 de abril de 1990 el antiguo Tribunal Superior, Sala de San Juan, lo declaró no culpable; ello no obstante, el magistrado que presidió los procedimientos hizo constar "que en cuanto a la Ley Notarial puede haber un delito pero en ese caso no puede intervenir".

El 23 de octubre de 1990, previo Informe y autorización de este Tribunal, el Procurador General presentó querella sobre conducta profesional impropia de parte del notario Caratini Alvarado; le imputó violar los Cánones 35 y 38[2] de Etica Profesional al preparar los affidávits

---

[1] La empleada del Banco, Sra. Hilda Batiz Pereira, se percató del fraude pues conocía que la Sra. Deyó Ferrer no era jefe de familia, no tenía hijos y los dos (2) mencionados en los affidávits eran hijos de su hermana Ileana, quien trabajaba en la United Mortgage Corporation, división de subsidios de viviendas otorgados por el Banco de la Vivienda. Junto con los affidávits, las hermanas Deyó Ferrer falsificaron los certificados de nacimiento de los hijos de Ileana para que apareciera Carmen como madre.

Aunque las hermanas Deyó Ferrer habían cometido varios delitos, la fiscalía les ofreció inmunidad a cambio de sus testimonios contra el querellado Caratini Alvarado. Aceptaron la oferta y cumplieron sentencias en probatoria de tres (3) años.

[2] En lo pertinente, reza:

> "El abogado debe ajustarse a la sinceridad de los hechos al examinar los testigos, al redactar affidavits u otros documentos, y al presentar causas." (Enfasis suplido.)

Por su parte, el Canon 38 consigna:

y que incumplió la Ley Notarial <u>al no incluir los affidávits en el informe</u>

<u>mensual correspondiente radicado en la Oficina de Inspección de Notarías</u>.

En su contestación, el Lcdo. Caratini Alvarado aceptó "que la firma

que aparece en los affidávits es la del querellado, así como el sello

notarial en ambos documentos. El querellado admite que la firma es la suya

y admite que no se incluyeron en el Registro de Affidávits ni se informaron

en el Indice Notarial. Esto [conforme su alegación] obedece a que obviamente

<u>fueron sustraídas por la declarante</u> en el plan común para defraudar al Banco

de la Vivienda así como la United Mortgage sin darse o percatarse el

querellado de la anomalía, puesto que la secretaria en su función, ocultó

estos hechos, dando margen así a que no figuraran en el Registro ni en el

Informe". (Enfasis suplido.) Además, adujo Caratini Alvarado que el

testimonio de la Sra. Deyó Torres no debería merecer crédito pues fue a

cambio de una promesa de inmunidad de parte del ministerio fiscal.

Designamos Comisionado Especial al ex-Juez Superior, Lcdo. Manuel

Reyes Serrano. Previo el trámite y vista correspondiente, el Comisionado

presentó su Informe. En lo pertinente concluyó:

> "A mi juicio la prueba no sostiene <u>fuera de duda razonable</u>
> <u>los cargos que se imputan al querellado</u>. Sin embargo, sugiere
> que el querellado no llevaba su notaría con el cuidado que se
> espera de un notario público.
>
> Entiendo que toda declaración jurada debe anotarse en el Registro
> de Declaraciones Juradas en el momento en que el notario las autoriza y
> no en la forma que utilizaba el notario querellado, sacando copias
> fotostáticas para luego llevarlas al Registro por las noches o por las
> tardes."

No estamos de acuerdo; esto es, <u>no</u> compartimos el criterio del

Comisionado Especial designado. Veamos por qué.

I

Evaluamos la prueba documental y testifical. Un análisis de la misma

revela que el querellado Caratini Alvarado operaba su oficina en un local

---

"**El abogado deberá esforzarse, al máximo de su
capacidad, en la exaltación del honor y dignidad de
su profesión, aunque el así hacerlo conlleve**

cercano a la División de Vehículos de Motor del Departamento de Obras Públicas. Con características de "negocio de masa", tramitaba cincuenta (50) o más declaraciones de autenticidad diarias. Aun así, carecía de los servicios de una secretaria permanente y en la mayoría de los casos él, o su esposa, las preparaban y anotaban en el Registro de Affidávits. Aceptó que, cuando había mucho trabajo, sacaba "copia del documento y se dejaba dentro del Libro de Affidávits y se archivaban en orden de número para eventualmente en la tarde, pasarlo al libro". (T.E., pág. 73) No existe constancia de que las declaraciones objeto de querella fueron juramentadas el 23 de agosto de 1985 y numeradas 17033 y 17034; no aparecen en el Registro de Affidávits ni las incluyó e informó en sus Indices Notariales. En los índices, estos números fueron asignados a otras dos (2) declaraciones, autorizadas las mismas tres (3) días más tarde. No hay prueba, aparte de su propio testimonio, que demuestre la alegación del querellado Caratini Alvarado a los efectos de que los affidávits fueron sustraídos por la Sra. Deyó Ferrer.

En la declaración jurada que prestó la Sra. Deyó Ferrer en la investigación criminal —que forma parte del caso sometido en instancia— en torno a su relación con el querellado Caratini Alvarado, ésta afirmó:

> "P. Le pregunto si usted conoce el Lcdo. Félix Caratini Alvarado.
>
> R. Sí, señor.
>
> P. Desde cuándo lo conoce?
>
> R. Lo conozco desde enero de 1985, aproximadamente.
>
> P. Cómo conoció al señor Caratini Alvarado?
>
> R. Me lo presentó una amiga de nombre Rosana Mercedes.
>
> P. Cómo conoció Rosana Mercedes al señor Caratini?
>
> R. Ella trabajaba con un señor llamado Don Luis tirando fotos. Ese señor era el padrino de un sobrino de Rosana y era además uno de los dueños del local donde el Lcdo. Caratini tenía su oficina.
>
> P. A qué se dedicaba el Lcdo. Caratini en esa oficina?
>
> R. A traspasos de licencias y affidavits.

---

sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia."

P. Le pregunto si en alguna ocasión usted ha visitado la oficina del Lcdo. Caratini en ese lugar que usted menciona.

R. Sí, señor.

P. Con qué frecuencia visitaba usted esa oficina para el año 1985?

R. La visitaba frecuentemente, a veces iba todos los días, acompañada de Rosana." (Declaración Jurada Núm. 166 de 25 de febrero de 1988.)

**En la vista evidenciaria subsiguiente ante el Comisionado Especial**, a preguntas del representante legal del querellado, la Sra. Deyó Ferrer reiteró:

"P. ¿Cuán bien la conocía el Lcdo. Caratini a usted, sus cricunstancias personales?

R. Bueno, que él sabía que yo no era casada y que no tenía hijos.

P. ¿Por qué usted asume que él sabía eso?

R. Porque del tiempo que nos estuvimos conociendo al tiempo que le hice la solicitud de la affidávit, ya había pasado, y nosotros habíamos dialogado, nos conocíamos en cuanto al estatus y demás." (T.E., pág. 10) (Enfasis suplido.)

II

Es norma legal reiterada que "en las declaraciones de autenticidad el notario certifica sobre la veracidad de la o las firmas, no sobre el contenido del documento". P. Malavet Vega, Compendio de Derecho Notarial Puertorriqueño, pág. 98 (1989); Art. 56, Ley Notarial. Sin embargo, hemos resuelto, citando al propio Malaret Vega, que "[e]n el affidavit, el notario certifica, expresa que considera auténtica, la firma de una persona. Esto supone un conocimiento directo, personal, indubitado, de la persona que suscribe." Rodríguez Vidal v. Benvenutti, 115 D.P.R. 583, 589 (1984). (Enfasis suplido.)

Al respecto, en Rodríguez Vidal v. Benvenutti, supra, pág. 587-88, consignamos:

"la certificación del notario de la autenticidad de la firma puede ser de juramento o de simple reconocimiento. E. Menéndez, Lecciones de Derecho Notarial, New Hampshire, Ed. Equity, 1967, pág. 64. Bajo cualesquiera de esas alternativas siempre adopta un plano documental, esto es, se reduce a

escrito. Su importancia radica en que presupone una correspondencia real y legítima entre el compareciente y la firma, a base del principio medular de la fe de conocimiento. In re: Olmo, 113 D.P.R. 441 (1982). Dicho de otro modo, 'ese hecho implica el testimonio notarial de que el firmante estuvo ante él y de que, en este acto, puso su firma en el documento y, además, lleva implícito, aunque no se exprese en la redacción del testimonio, el conocimiento o la identificación del firmante por la documentación presentada o por otro medio'." D.L. Lanfranchi, Formación del Acto Notarial, 103 Rev. Der. Not. 297, 364 (1979). (Enfasis suplido.)

Apliquemos esta normativa al asunto ante nos.

## III

En los extremos pertinentes, en el affidávit número 17,033 se hizo constar, como circunstancias personales de la Sra. Deyó Ferrer, que era mayor de edad, madre soltera de dos (2) hijos, paramédica, ciudadana americana y vecina de Bayamón, Puerto Rico. Y al respecto, el querellado Caratini Alvarado consignó:

"Jurado y suscrito ante mí por la persona cuyo nombre y demás circunstancias personales son como se indica anteriormente, y a quien Doy Fe de conocer personalmente hoy día 23 de agosto de 1985 en San Juan, Puerto Rico.

(Firmado y sellado)

_____"

En el afidávit número 17,034 las circunstancias personales de la Sra. Deyó Ferrer consignadas fueron: que era mayor de edad, soltera y residente de Bayamón. Sin embargo, en el jurat el querellado Caratini Alvarado certificó:

"---Jurada y suscrita ante mí por doña Carmen Deyó Ferrer, mayor de edad, [en blanco], y vecina de Bayamón, Puerto Rico --- a quien doy fe de conocer personalmente en San Juan, Puerto Rico, hoy día 23 de agosto de 1985.

(Firmado y sellado)

_____
Funcionario que tomó juramento"

Es altamente impropio e irregular que un notario suscriba un juramento en el cual deje en blanco y no haga constar el status civil del compareciente. Es correcto que resulta prácticamente imposible concluir, o saber, si el hecho de que en el affidávit se dejara en blanco el dato sobre el status civil de la declarante fue hecho conscientemente por el

notario Caratini Alvardo, para "librarse de responsabilidad", o si ese hecho se debió a un descuido de éste.

La dación de fe del conocimiento de una persona por un notario no implica un deber de investigación exhaustiva de éste, aunque sí de averiguaciones mínimas que no necesariamente tiene que incluir información sobre cuántos hijos tiene la compareciente. Entendemos que conocer personalmente a alguien, para dar fe notarial sin utilizar algún método supletorio de conocimiento, implica solamente dar fe de que la persona que comparece a firmar es la misma que, según el conocimiento personal del notario, alega ser. Cintrón Ramos v. Borrás Marín, res. el 13 de noviembre de 1997, 144 D.P.R. ____ (1997); In re: Ramos Vélez, res. el 1 de junio de 2000, 2000 TSPR 82.[3] Ahora bien, si el notario tiene el conocimiento personal de que un compareciente no tiene hijos y, a sabiendas, miente expresando que sí los tiene, el notario incurre en falta ética grave. En el presente caso, y conforme la declaración jurada prestada por la Sra. Deyó Ferrer ante el Comisionado Especial, el notario Caratini Alvarado sabía que esta dama no era una madre soltera con dos hijos. Al así actuar, el notario Caratini Alvarado violó las disposiciones de los Cánones 35 y 38 de Etica Profesional.

IV

¿Quedaron probados los cargos que le imputara el Procurador General de Puerto Rico al notario Félix Caratini Alvarado?

El comisionado especial que designáramos para entender en el caso contestó la anterior interrogante en la negativa, al aplicar el criterio de "más allá de duda razonable". Erró, no hay duda, al así actuar. Este

---

[3] De hecho, es norma de este Tribunal que el "conocimiento personal" se puede dar a pocas horas antes de firmar o comparecer ante un notario. Véase, Cintrón Ramos v. Borrás Marín, supra; Ramírez Lebrón v. Registrador, 131 D.P.R. 76 (1992). Existe gran liberalidad en medios para satisfacer el requisito de "conocimiento personal de los otorgantes". Tan reciente con el In re Rosa Marcano, res. el 29 de junio de 2000, 2000 TSPR 104, expresamos que el notario no incurría en violación a la Ley Notarial cuando al dar su fe de conocimiento

criterio, como es sabido, es de aplicación en el campo de lo criminal. A esos efectos debe recordarse que este Tribunal --en In re: Soto López, 135 D.P.R. 642 (1994)-- resolvió que el hecho de que un miembro de la profesión de abogado sea declarado inocente de unos cargos criminales --por no haberse podido demostrar su culpabilidad más allá de duda razonable-- no impide que contra dicho abogado se radique una querella por conducta profesional, en relación con los mismos hechos que dieron lugar a la acción penal, y que éste sea sancionado o disciplinado por este Tribunal. Siendo ello así, resulta obvio que el criterio a ser utilizado por este Tribunal, en las acciones disciplinarias, no puede ser el de "más allá de duda razonable". Tampoco, a nuestro entender, procede la utilización o aplicación, en esta clase de situaciones, del criterio de "preponderancia de la prueba"; criterio que, como es sabido, es el utilizado en los casos civiles comunes y ordinarios.

Somos de la opinión, y así lo establecemos en el día de hoy, que el criterio a utilizarse por este Tribunal en casos disciplinarios lo es el de "prueba clara, robusta y convincente". Debe recordarse que este Tribunal, en el caso de P.P.D. v. Admor. General de Elecciones, 111 D.P.R. 199 (1981), estableció que cuando se trata de la negación de un derecho fundamental, como lo es el derecho al voto, el debido proceso de ley exige que el valor y suficiencia de la prueba sean medidos con un criterio más riguroso que el de la preponderancia de la prueba. A esos efectos, resolvimos que en esta clase de situaciones se requiere "...prueba clara, robusta y convincente, no afectada por reglas de exclusión ni a base de conjeturas".

En casos disciplinarios contra miembros del foro está envuelto el derecho de éstos a ganarse el sustento como abogados. A esos efectos, debe mantenerse presente que este Tribunal --en Amy v. Adm. del Deporte Hípico, 116 D.P.R. 414, 421 (1985)-- resolvió que el "...derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio

---

personal de los comparecientes, éstos lo engañan en cuanto a la identidad de uno de ello.

inalienable al hombre, preexistente a la más antigua de las constituciones conocidas".

Siendo ello así --y no existiendo controversia sobre el hecho de que en un proceso disciplinario está en juego el título de un abogado, esto es, el derecho a ganarse la vida como tal-- somos de la opinión que el criterio a utilizarse en esta clase de situaciones debe ser el mismo que utilizamos en P.P.D. v. Admor. General de Elecciones, ante; esto es, el de "prueba clara, robusta y convincente, no afectada por reglas de exclusión ni a base de conjeturas".

V

Aplicando el antes mencionado criterio de "prueba robusta y convincente" --y contrario a la conclusión del Comisionado Especial, a los efectos de que, en sus propias palabras, la prueba presentada meramente "sugiere que el querellado no llevaba su notaría con el cuidado que se espera de un notario público"-- somos de la opinión que los cargos imputados efectivamente fueron probados, mediante prueba clara, robusta y convincente, no sólo en cuanto a que dicho notario preparó los affidávits a sabiendas de que eran falsas las circunstancias personales de la declarante que se hicieron constar en los mismos sino que, igualmente, en cuanto a que el referido notario no reportó dichos affidávits en el informe mensual que todo notario viene en la obligación de radicar ante la Oficina de Inspección de Notarías.

En otras palabras, concluimos que, al redactar ambos affidávits, el notario Caratini Alvarado no se ajustó al deber de sinceridad del Canon 35 de Etica Profesional. In re: Soto, 134 D.P.R. 772 (1993). Igualmente somos del criterio que éste tampoco se esforzó por exaltar la dignidad y honor de la profesión de abogado, reflejando su conducta la "apariencia de impropiedad" vedada por el Canon 38 de los de Etica Profesional.

Al no incluir los affidávits por él otorgados ni en su registro de affidávits ni en los informes mensuales que viene obligado a remitir a la Oficina de Inspección de Notarías, violó el referido notario las disposiciones del Artículo 12 de la Ley Notarial. Véase: In re: Lago

<u>Giberga</u>, 134 D.P.R. 502 (1993); <u>In re: Santiago Arroyo</u>, 132 D.P.R. 239 (1992); <u>In re: Jiménez Sabat</u>, 130 D.P.R. 202 (1992); <u>In re: Gómez Rijos</u>, 129 D.P.R. 811 (1992); <u>In re: Porrata-Doria Harding</u>, 128 D.P.R. 416 (1991); <u>In re: Cruz Ramos</u>, 127 D.P.R. 1005 (1991); <u>In re: Nogueras Cartagena</u>, 127 D.P.R. 574 (1990); <u>In re: Meléndez Mulero</u>, 124 D.P.R. 815 (1989); <u>In re: Serrano Casanova</u>, 124 D.P.R. 800 (1989); <u>In re: Sagardía Ruiz</u>, 124 D.P.R. 743 (1989); <u>In re: Hernández Ramírez</u>, 120 D.P.R. 366 (1988).

VI

Un análisis y evaluación de la conducta incurrida por el notario Félix Caratini Alvarado nos convence de que, atendidos los hechos del caso, la suspensión del ejercicio de la notaría por el término de un (1) año es una sanción disciplinaria justa y adecuada.

Se dictará Sentencia de conformidad.

FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


In re:

Félix Caratini Alvarado
                              CP-1990-791




SENTENCIA


San Juan, Puerto Rico, a  9 de marzo de 2001


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia suspendiendo del ejercicio de la notaría al abogado Félix Caratini Alvarado por el término de un (1) año, contado el mismo a partir de la fecha en que la presente Sentencia advenga final y firme y hasta tanto otra cosa disponga este Tribunal.

La Oficina del Alguacil de este Tribunal procederá, de inmediato, a incautarse de la obra y sello notarial de Félix Caratini Alvarado, luego de lo cual entregará la misma a la Oficina de Inspección de Notarías para el correspondiente examen e informe a este Tribunal.

Así lo pronunció, manda el Tribunal y certifica la Subsecretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri concurre en el resultado sin opinión escrita.


                              Carmen E. Cruz Rivera
                                 Subsecretaria del Tribunal Supremo