ORDEN
Debido a la no intervención del Juez Asociado Señor Re-bollo López y la Juez Asociada Señora Rodríguez Rodríguez, se constituye una Sala Especial integrada por el Juez Presidente Señor Hernández Denton, el Juez Asociado Señor Rivera Pérez y la Jueza Asociada Señora Fiol Matta, para entender en el Caso Núm. CP-2002-03, In re Max Olivera Mariani.
Lo decretó y ñrma.
(Fdo.) Federico Hernández Denton

Juez Presidente

CERTIFICO:
(Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

Roberto■ J. Sánchez Ramos y Salvador J. Antonetti Stutts, procuradores generales, Yvonne Casanova Pelosi y Miriam Soto Contreras, procuradoras generales auxiliares, Kenneth Pamias Velázquez y Mariana D. Negrón Vargas, subprocuradores generales, parte querellante; María Elena Vázquez Graziani, Guillermo Figueroa Priefo y Pedro Jiménez, abogados de la parte recurrida; Angel F. Rossy García, comisionado especial.
Sala Especial integrada por el Juez Presidente Señor. Hernández Denton, el Juez Asociado Señor Rivera Pérez y la Jueza Asociada Señora Fiol Matta.
per curiam:
Nos corresponde determinar si incurrió en apariencia de conducta impropia un abogado al negociar, en su carácter de presidente de una entidad privada con fines de lucro, un contrato con el Gobierno a favor de dicha compañía. Por entender que no se presentó prueba clara, robusta y convincente que nos permita concluir que la con-ducta del querellado se apartó de las normas éticas que rigen la profesión de la abogacía, ordenamos la desestima-ción y el archivo de la querella presentada contra éste.
I
El presente caso es producto de un largo y complejo trá-mite procesal que comenzó en diciembre de 1996 cuando la anterior Contralor del Estado Libre Asociado de Puerto Rico, Hon. Ileana Colón Cario, cursó una carta al entonces Juez Presidente de este Tribunal, Hon. José A. Andréu García. En su misiva, la Contralor sostuvo que de una au-ditoría especial de las operaciones fiscales del Departa-mento de Salud, específicamente en el Hospital de Área de Carolina, surgían varias irregularidades cometidas alega-damente durante el proceso de contratación y prestación de servicios médico-hospitalarios por el querellado Max Olivera Mariani, quien presidía y era el único accionista de la compañía HMCA, Inc. (H.M.C.A.).
*502 H.M.C.A. había sido contratada por el Departamento de Salud en 1982 para operar y administrar el aludido hospital en Carolina. Posteriormente, el Departamento de Salud y H.M.C.A. acordaron enmendar el contrato para ampliar los servicios que la compañía prestaba en el mencionado hospital y, además, incluir la operación y administración por ella de un segundo hospital ubicado en Fajardo. Es, precisamente, sobre los sucesos relacionados con la nego-ciación y contratación de esta enmienda que la Contralor basó su queja. En particular, la Contralor señaló que para obtener el financiamiento requerido durante la transac-ción, Olivera Mariani hizo falsas representaciones al pre-sentar documentación que había sido dejada sin efecto.(1)
Remitida la queja a Secretaría para su tramitación or-dinaria y tras numerosas comparecencias de Olivera Ma-riani, de la Oficina del Contralor y del Procurador General, ordenamos a este último la presentación de la querella correspondiente. En cumplimiento con lo anterior, el Pro-curador General formuló una querella contra Olivera Ma-riani en la que sostuvo que éste "pudo haber violentado” el Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.(2) Olivera Mariani contestó la querella y negó las im-putaciones en su contra.
Posteriormente, designamos al Hon. Angel F. Rossy *503 García para que, en calidad de Comisionado Especial, pre-sidiera la vista evidenciaría, recibiera y aquilatara la prueba y nos rindiera un informe con sus determinaciones de hecho y su recomendación. A esos fines, el Comisionado Especial ha formulado su informe, en el cual determinó lo siguiente:
Un análisis y evaluación de la prueba que fue aportada en el proceso nos obliga a concurrir con el criterio de la Oficina del Procurador General expresado en su Moción en Cumplimiento de Orden a los efectos de que en el caso que nos ocupa nos encontramos ante una total “ausencia de evidencia que su-giera o demuestre conducta intencional, impropia o deshon-rosa del querellado mientras realizaba gestiones privadas, no como abogado que lo hagan indigno de pertenecer al foro”. Informe del Comisionado Especial, pág. 33.
... [L] a total ausencia de prueba que permita inferir y menos concluir proceder indebido por parte del licenciado Olivera Mariani desviste de todo mérito la querella que nos ocupa y conduce a un solo curso decisional, recomendar su desestima-ción y archivo en todas sus partes. íd., pág. 40.
Expongamos el trasfondo fáctico según surge de los he-chos estipulados por las partes y de las determinaciones del Comisionado Especial.
A. El 1 de julio de 1982 H.M.C.A., representada por Olivera Mariani, y el Departamento de Salud, represen-tado por su Secretario, el Dr. Jaime Rivera Dueño, suscri-bieron un contrato mediante el cual acordaron privatizar la administración y operación del Hospital de Area de Carolina, conocido como el Hospital Federico Trilla. Mediante el referido contrato, H.M.C.A. se obligó, como contratista independiente, a prestar servicios de nivel secundario(3) a *504 pacientes médico-indigentes de Carolina, Trujillo Alto, Lo-íza y Canóvanas. A cambio de ello, recibiría un pago anual, más las ganancias percibidas producto del uso de las ins-talaciones hospitalarias para atender pacientes privados. El contrato tendría una vigencia de diez años, sujeto a la disponibilidad de fondos al comienzo de cada año. De esta manera, el pago anual a H.M.C:A. se negociaba anual-mente por adelantado.
A principios de 1987 H.M.C.A. solicitó al Departamento de Salud un aumento de los fondos para el 1988, lo que implicaba un presupuesto anual de $14.5 millones para dicho año fiscal. El entonces Secretario del Departamento de Salud, Dr.. Luis Izquierdo Mora, contestó la solicitud de H.M.C.A. por escrito, indicando que la agencia había apro-bado un presupuesto ascendente a $12.5 millones. Ante tales circunstancias, H.M.C.A. y el Departamento de Salud entablaron negociaciones a mediados de julio de 1987 con el propósito de llegar a un acuerdo.
Para esa época, el Hospital Subregional de Fajardo, el cual se encontraba bajo la administración privada de la Corporación de Servicios Médico-Hospitalarios de Fajardo (C.S.M.H.F.), cuyo propietario era el Dr. Carlos Lopategui, confrontaba una situación precaria, ya qüe dicha compañía se había acogido a la Ley de Quiebras. Este hospital brin-daba servicios a los pacientes médico-indigentes de Fa-jardo, Ceiba, Luquillo, Río Grande, Vieques y Culebra. La deuda de C.S.M.H.F. por la operación del hospital excedía los $8 millones.
Dado que la situación económica inestable de C.S.M.H.F. ponía en peligro la oferta de servicios de salud a los pacientes médico-indigentes de la región, el Departa-mento de Salud contempló concederle a H.M.C.A. el au-mento solicitado por ésta para la administración del Hospital de Área de Carolina, a cambio de que dicha compañía prestara servicios terciarios en ese hospital, adquiriera la C.S.M.H.F. y asumiera la operación y administración del Hospital Subregional de Fajardo. Las partes emprendieron una serie de negociaciones al respecto, las cuales culmina- *505 ron el 24 de septiembre de 1987 con la aprobación de una enmienda al contrato original de 1982 —la Enmienda H— mediante la cual, efectivamente, H.M.C.A. se comprometía a prestar servicios terciarios en el Hospital de Área de Carolina a cambio de un aumento mensual de $175,000 por parte del Departamento de Salud y de la Administración de Facilidades y Servicios de Salud (A.F.A.S.S.), más la extensión de la vigencia del contrato por cinco años adicio-nales, hasta 1997.
Durante la negociación, H.M.C.A. llegó a un acuerdo con el doctor Lopategui para la. compra de las acciones de C.S.M.H.F. Antes de consumar la transacción que dio lugar a la Enmienda H, el Secretario de Salud informó por es-crito a Olivera Mariani que la aprobaría sujeto a las si-guientes condiciones, las cuales H.M.C.A. aceptó: (1) que la Corte de Quiebras impartiera su aprobación al traspaso de las acciones de C.S.M.H.F. a H.M.C.A.; (2) que H.M.C.A. pagara por completo las deudas de C.S.M.H.F., y (3) que C.S.M.H.F. desistiera de todos los pleitos judiciales que ha-bía instado contra el Departamento de Salud y el Gobierno. Las partes acordaron mantener el presupuesto anual asig-nado al Hospital Subregional de Fajardo que estuviera vi-gente en ese momento.
Por su parte, H.M.C.A. condicionó su participación en el negocio a que el Departamento de Justicia expresara su aprobación. Debido, a lo anterior, semanas antes de la firma de la Enmienda H, el entonces Secretario de Justi-cia, Ledo. Héctor Rivera Cruz, emitió una opinión en la que sostuvo que la transacción propuesta por las partes se ajustaba a derecho. El Secretario expresó que le correspon-día al Departamento de Salud prestar su consentimiento al negocio si entendía que éste era beneficioso para el interés público. Además de dicha opinióñ, las partes sostuvieron una reunión en el Departamento de Justicia con el propó-sito de que éste ofreciera asesoramiento sobre la transacción. En la reunión participaron el propio Secreta-rio de Justicia, el Subsecretario de Justicia, el Secretario Auxiliar de Asesoramiento, el Secretario de Salud, el ase- *506 sor legal de éste, Olivera Mariani y su asesor legal, el Ledo. José Trías Monge. Durante la reunión se explicaron los detalles de la transacción, la cual no fue objetada por el Departamento de Justicia.
Afinados los términos del acuerdo y como parte de la negociación, H.M.C.A. llevó a cabo los trámites necesarios para obtener el financiamiento requerido para la transac-ción, el cual consistió en una emisión de bonos de la Auto-ridad para el Financiamiento de Facilidades Industriales, Médicas, para la Educación y Control de Contaminación Ambiental de Puerto Rico. La mensualidad adicional de $175,000 resultante de la Enmienda H constituiría la fuente de pago de la emisión. A tono con lo anterior, las partes suscribieron un acuerdo de cesión a favor de la en-tidad Prudential-Bache Capital Funding Puerto Rico, Inc. (Pru-Bache), mediante el cual H.M.C.A. le cedió a ésta el derecho a recibir del Departamento de Salud y de la A.F.A.S.S. el mencionado pago mensual de $175,000. En esta cesión, el Departamento de Salud y la A.F.A.S.S. se comprometieron a pagar la referida mensualidad directa-mente a la cesionaria Pru-Bache, independientemente de que H.M.C.A. prestara los servicios contratados por el De-partamento de Salud. Tanto la Enmienda H como el con-trato de cesión fueron remitidos al Secretario de Hacienda y a la Oficina de Presupuesto y Gerencia por parte del Secretario de Salud.
Seis meses después de la firma de la Enmienda H, el Ledo. Lino Saldaña, asesor legal de la Fortaleza, cursó una misiva al licenciado Trías Monge en la cual le indicó varios señalamientos que, a su juicio, implicaban que la referida enmienda era nula. El licenciado Saldaña explicó que la Enmienda H extendía la vigencia del contrato hasta 1997, lo cual alegadamente era contrario a un estatuto vigente en ese momento.(4) Por lo tanto, sugirió rescindir la en- *507 mienda y sustituirla por una idéntica, cuya vigencia no excediera del 30 de junio de 1992, que era la fecha de ex-piración del contrato suscrito originalmente entre H.M.C.A. y el Departamento de Salud. Inicialmente, H.M.C.A., por conducto del licenciado Trías Monge, accedió a evaluar la modificación propuesta a la Enmienda H, a los efectos de reducir el término de su vigencia hasta 1992. Ante la posibilidad de que el mencionado cambio fuera efectuado, el Secretario de Salud firmó los documentos correspondientes.
Sin embargo, según surge de los hechos estipulados por las partes, posteriormente H.M.C.A. descartó la posibili-dad de aceptar la modificación propuesta, debido a que ésta no le permitiría cumplir con los compromisos económi-cos contraídos con los dos hospitales. De esta manera, el Secretario de Salud decidió honrar el compromiso original con vigencia hasta el 1997, según pactado en la Enmienda H. Conforme a la prueba creída por el Comisionado Especial, éste fue el documento que se sometió durante las ne-gociaciones para obtener el financiamiento. Fue, además, el documento que se inscribió en los archivos del Departa-mento de Salud y el que utilizaron las partes en los distin-tos pleitos judiciales relacionados con el caso de autos.(5)
Aunque el término de vigencia de la Enmienda H per-maneció inalterado, en respuesta a uno de los señalamien-tos del licenciado Saldaña, H.M.C.A., el Departamento de *508 Salud y Pru-Bache acordaron rescindir el contrato de ce-sión firmado anteriormente, liberando así al Departa-mento de Salud y a la A.F.A.S.S. de la obligación de pagarle directamente á Pru-Bache la mensualidad de $175,000, in-dependientemente de que H.M.C.A. prestara los servicios pactados. De este modo, las partes suscribieron un se-gundo contrato de cesión que sólo comprometía al Depar-tamento de Salud y a la A.F.A.S.S. frente a H.M.C.A. El contrato aclaraba que H.M.C.A. y Pru-Bache podían acor-dar entre sí que el Departamento de Salud pagara la men-sualidad directamente a Pru-Bache a través de una cesión ordinaria, lo cual efectivamente llevaron a cabo. El nuevo acuerdo relevó ál Departamento de Salud y a la A.F.A.S.S. de responsabilidad directa frente a Pru-Bache, entidad que sólo recibiría los pagos provenientes de las referidas agen-cias en calidad de agente pagador del bonista. Los pagos estarían sujetos al cumplimiento por parte de H.M.C.A. de sus obligaciones.
Un tiempo después de pactada la Enmienda H, surgie-ron desacuerdos entre las partes que generaron una fuerte polémica públicá y dieron lugar a que se presentaran diversos pleitos civiles, tanto en la jurisdicción local como en la federal. Incluso, Olivera Mariani fue acusado criminal-mente por hechos relacionados a los negocios que sostuvo con el Departamento de Salud. Ante las imputaciones que se hicieron sobre los contratos, la Oficina del Contralor realizó varias auditorías. Eventualmente, mediante una transacción suscrita en agosto de 1992 por el Departa-mento de Salud, la A.F.A.S.S., el Departamento de Justi-cia, Olivera Mariani, su esposa y H.M.C.A., representada por el querellado, las partes acordaron la desestimación con perjuicio de las demandas y reconvenciones , pendien-tes, así como el sobreseimiento de los procedimientos cri-minales instados contra H.M.C.A. y Olivera Mariani, a cambio de que el querellado transfiriera al Departamento de Salud la administración y operación de los dos hospita-les administrados hasta ese momento por su compañía.
*509 A la luz de estos hechos, debemos determinar si Olivera Mariani violó el Canon 38 del Código de Ética Profesional, supra.
II
Al examinar el recurso de autos partimos de la premisa de que los procedimientos disciplinarios instados ante este Tribunal son independientes de las acciones legales —sean éstas civiles o criminales— que surjan de los mismos hechos que provocaron la querella de conducta profesional. In re De la Texera Barnes, 165 D.P.R. 526 (2005); In re Deynes Soto, 164 D.P.R. 327 (2005). En particular, debemos recordar que la absolución de un abogado en un proceso criminal instado en su contra —o incluso la culminación de dicho proceso de otro modo igualmente favorable para el letrado— no es impedimento para que evaluemos los mismos hechos que motivaron la acción penal y juzguemos si su conducta estuvo reñida con el Código de Ética Profesional. In re Barreto Ríos, 157 D.P.R. 352 (2002); Trib. Exam. Méd. v. Cañas Rivas, 154 D.P.R. 29 (2001); In re Soto López, 135 D.P.R. 642 (1994); In re Franco Soto, 115 D.P.R. 740 (1984). Ello responde al hecho de que se trata de procedimientos que persiguen objetivos distintos, pues a diferencia del procedimiento criminal, el fin del procedimiento disciplinario no es punitivo, sino proteger al público y a la profesión legal. In re Barreto Ríos, supra.
A tono con lo anterior, como es sabido, a diferencia de los casos civiles y penales, el estándar de evidencia requerido en los procedimientos disciplinarios es el de prueba clara, robusta y convincente, no afectada por reglas de exclusión ni a base de conjeturas. Ello es así porque estos casos involucran el derecho del abogado a ganarse su sustento, lo cual es un derecho fundamental. In re Rodríguez Mercado, 165. D.P.R. 630 (2005); In re Deynes Soto, supra; In re Caratini Alvarado, 153 D.P.R. 575 (2001). De *510 esta forma, para que proceda el sancionar a un miembro de la profesión por alegada conducta contraria al Código de Ética Profesional, el Procurador General deberá demostrar ante este Tribunal que existe prueba clara, robusta y con-vincente de que se cometieron las violaciones deontológicas imputadas.
Tomando estos preceptos como punto de partida, pase-mos a examinar la normativa referente al Canon 38 del Código de Ética Profesional, supra.
A. El Canon 38 del Código de Ética Profesional, supra, exige a todo abogado el conducirse en forma digna y honorable, no sólo en el desempeño de su profesión, sino también en el ámbito de su vida privada. Ello, según el propio canon, responde a la confianza depositada en el abogado como miembro de la ilustre profesión legal. In re Barreto Ríos, supra; In re Sepulveda, Casiano, 155 D.P.R. 193 (2001). A tono con lo anterior, hemos resuelto que no existe dicotomía alguna entre la vida cotidiana del abogado y el ejercicio de su profesión. La aplicación del Código de Ética Profesional alcanza tanto la vida profesional como la vida privada de un abogado. In re Sepulveda, Casiano, supra; In re Bryan, Vargas, 150 D.P.R. 1 (2000). Por lo tanto, este Tribunal, dado su poder inherente sobre la profesión de la abogacía, puede sancionar a un miembro de la clase togada por una conducta relacionada con su vida personal que se desvíe de los principios establecidos en el mencionado Código.
Ahora bien, no todo tipo de actuación privada de un abogado amerita nuestra intervención, sino aquella que afecte sus cualidades morales o lo haga indigno de pertenecer al foro. In re Sepúlveda, Casiano, supra; Colegio de Abogados de P.R. v. Barney, 109 D.P.R. 845 (1980).
El Canon 38 del Código de Ética Profesional, supra, también dispone que todo abogado debe “esforzarse, al máximo de su capacidad, en la exaltación del honor y dig- *511 nidad de su profesión, aunque el así hacerlo conlleve sacri-ficios personales y debe evitar hasta la apariencia de con-ducta profesional impropia”. Reiteradamente, al inter-pretar la disposición anterior, hemos expresado que cada abogado es un espejo en el cual se refleja la imagen de la profesión, por lo que debe actuar, tanto en su vida profesio-nal como en su vida privada, con limpieza, lealtad y el más escrupuloso sentido de responsabilidad. In re Quiñones Ayala, 165 D.RR. 138 (2005); In re Barreto Ríos, supra; In re Sepúlveda, Casiano, supra; In re Silvagnoli Collazo, 154 D.P.R. 533 (2001); In re Coll Pujols, 102 D.P.R. 313 (1974).
Asimismo, hemos aclarado que los miembros de la profesión jurídica, por ser oficiales del Tribunal, ostentan una posición revestida de alto interés público. In re Pujol Thompson, 171 D.P.R. 683 (2007); In re Meléndez La Fontaine, 167 D.P.R. 111 (2006). De este modo, la finalidad de los cánones del Código de Etica Profesional es promover el desempeño profesional y personal del abogado a tono con los más altos principios de conducta decorosa, lo que redunda en beneficio de la profesión, de la ciudadanía y de las instituciones de justicia del país. In re Izquierdo Stella, 154 D.P.R. 732 (2001). Particularmente, en el contexto del Canon 38 del Código de Etica Profesional, supra, hemos expresado que éste “es una convocatoria a un desempeño que no sólo debe ceñirse a las pautas éticas mínimas sino que debe ser reflejo del más alto calibre de excelencia humana”. In re Sepúlveda, Casiano, supra, pág. 205. Véase In re Nogueras Cartagena, 150 D.P.R. 667 (2000).
Conforme a lo anterior, es norma establecida que todo abogado tiene el deber de evitar hasta la apariencia de conducta impropia. La mera apariencia de conducta impropia puede resultar muy dañina al respeto de la ciudadanía por sus instituciones de justicia y a la confianza que los clientes depositan en sus abogados. Además, la apariencia de conducta impropia puede ser tan nociva sobre la imagen y confianza que tiene la ciudadanía en su gobierno *512 como la verdadera impropiedad ética. In re Sepúlveda Girón, 155 D.P.R. 345 (2001); In re Ortiz Brunet, 152 D.P.R. 542 (2000); In re Nogueras Cartagena, supra; In re Ríos Lugo, 119 D.P.R. 568 (1987); In re Rojas Lugo, 114 D.P.R. 687 (1983). Así, todo abogado debe cuidarse de que sus ac-tuaciones no den margen a la más leve sospecha de impropiedad. In re Rivera Vicente, 172 D.P.R. 349 (2007); In re Bonilla Rodríguez, 154 D.P.R. 684 (2001).
Recientemente, en In re Gordon Menéndez I, 171 D.P.R. 210 (2007), sostuvimos que la prohibición contra la apariencia de conducta impropia es un componente esencial del sistema de responsabilidad profesional. Allí aclaramos que el citado Canon 38 opera ex proprio vigore, por lo que cuando un abogado actúa en violación de éste, ello amerita nuestra intervención disciplinaria. En ese caso reafirmamos, además, lo resuelto en In re Sepúlveda Girón, supra, a los efectos de que la apariencia de conducta impropia tiene que sostenerse sobre la impresión que se le da al público de la violación efectiva de alguno de los cánones del Código de Ética Profesional.
Expuesto el derecho aplicable y a la luz del estándar de evidencia que se exige en estos casos, evaluemos si quedó probado que Olivera Mariani incurrió en la falta imputada.
m
Según surge del expediente, Olivera Mariani era el pre-sidente y único accionista de H.M.C.A. La conducta antié-tica que aquí se le imputa se relaciona únicamente con las negociaciones que, en tal calidad, éste llevó a cabo con el Departamento de Salud para la obtención de un contrato con esa agencia y para el financiamiento del negocio. Es-pecíficamente, la querella presentada contra Olivera Ma-riani alega que éste “pudo haber violentado” el Canon 38 en el transcurso de dichos acontecimientos. Sin embargo, luego de un cuidadoso estudio del extenso expediente que *513 tenemos ante nuestra consideración, ño hemos hallado prueba clara, robusta y convincente que nos lleve a con-cluir que el querellado incurrió en una conducta contraria a la normativa ética vigente.
No existe controversia en torno a que las negociaciones para la aprobación de la Enmienda H, así como para el financiamiento requerido como parte de ésta, fueron de na-turaleza altamente compleja. Ante tal circunstancia, el querellado no sólo estuvo asesorado de forma indepen-diente por el licenciado Trías Monge, sino que también con-dicionó la participación de H.M.C.A. en el negocio a que el Departamento de Justicia lo aprobara. Esto, según indica-mos, dio lugar a que el Secretario de Justicié emitiera una opinión en la que aprobó la transacción. También, se llevó a cabo una reunión en la cual participaron, además del querellado y su asesor, el propio Secretario de Justicia, el Subsecretario de Justicia, el Secretario Auxiliar de Aseso-ramiento, el Secretario de Salud y el asesor legal de éste. En dicha reunión se discutieron los pormenores de la tran-sacción, sin que se expresara objeción alguna de parte de los titulares del Departamento de Justicia ni del Departa-mento de Salud. De los hechos se desprende claramente que tanto el Departamento de Salud como el Departa-mento de Justicia participaron activamente en este pro-ceso y prestaron su anuencia al negocio con la corporación del querellado.
Ahora bien, la contralor Colón Cario alegó en su queja que Olivera Mariani incurrió en falsas representaciones al utilizar documentos inexistentes para obtener el financia-miento que necesitaba su compañía como parte de la contratación. Para ello, adujo que durante los trámites del financiamiento, el querellado se lucró al utilizar la En-mienda H que originalmente fue suscrita por las partes y que extendía la vigencia del contrato original hasta 1997, a pesar de que ésta había sido rescindida y sustituida por otra cuya vigencia expiraba en 1992. No obstante las refe-ridas imputaciones de Colón Cario, lo cierto es que no con- *514 tamos con evidencia clara, robusta y convincente para ra-tificar esta aseveración.
Según explicamos anteriormente y como lo estipularon las partes en su escrito ante el Comisionado Especial, luego de la aprobación de la Enmienda H H.M.C.A. con-templó sustituirla por una que no alterara la vigencia del contrato original suscrito con el Departamento de Salud para así atemperarla a los señalamientos del licenciado Saldaña. Sin embargo, de acuerdo con las mismas estipu-laciones de las partes, aun cuando el Secretario de Salud llegó a firmar los documentos correspondientes para efec-tuar el cambio propuesto, tras una serie de negociaciones, H.M.C.A. y el Departamento de Salud decidieron dejar in-alterada la enmienda originalmente suscrita por ellos. Al parecer, la duración del acuerdo hasta el 1997 era un ele-mento importante para que a H.M.C.A. le fuera viable cumplir con sus obligaciones contractuales de administrar y operar los mencionados hospitales de Carolina y Fajardo. De esta manera, no se probó que hubiera subsistido una segunda enmienda sustitutiva de la Enmienda H, por lo que de acuerdo con la evidencia contenida en nuestro ex-pediente, la documentación utilizada por el querellado es-taba vigente y era vinculante para las partes contratantes. De hecho, según indicamos anteriormente, durante uno de los litigios sostenidos entre la Oficina del Contralor y H.M.C.A., los representantes legales de la propia Oficina del Contralor sometieron la Enmienda H originalmente suscrita entre las partes como parte de los documentos de ese caso, por lo que representaron que dicho acuerdo era válido.
Finalmente, debemos notar que, como propietario de H.M.C.A., el querellado también evitó la apariencia de im-propiedad al rescindir el primer contrato de cesión a favor de la entidad financiera Pru-Bache. Como explicamos an-teriormente, esta primera cesión no sujetaba la obligación de pago del Departamento de Salud y de la A.F.A.S.S. frente a Pru-Bache al cumplimiento por H.M.C.A., por lo que la entidad financiera podría recibir el pago aunque *515 H.M.C.A. no prestara los servicios pactados. Acogiendo la recomendación del licenciado Saldaña, este acuerdo se sus-tituyó por otro que comprometía al Departamento de Salud y a la A.F.A.S.S. frente a H.M.C.A. solamente.
De un análisis de los documentos que obran en el expe-diente del caso de autos y de los hechos estipulados por las partes y contenidos en el Informe del Comisionado Especial, Hon. Angel Rossy García, se deduce que el Procurador General no contó con evidencia suficiente para demostrar de forma clara, robusta y convincente que Olivera Mariani incurrió en conducta impropia o que aparentara impropiedad. De hecho, según surge del propio Informe del Comisionado Especial, pág. 33, durante el procedimiento disciplinario el Procurador General sostuvo que se encon-traba ante un proceso con una total “ausencia de evidencia que sugiera o demuestre conducta intencional, impropia o deshonrosa del querellado mientras realizaba gestiones privadas, no como abogado, que lo hagan indigno de perte-necer al foro”. En estas circunstancias, debemos dar por concluido este procedimiento disciplinario, cuyo origen se remonta a la década de 1980.
IV
Por los fundamentos que anteceden, resolvemos que el licenciado Olivera Mariani no incurrió en violación al Canon 38 del Código de Etica Profesional, supra. En conse-cuencia, desestimamos la querella presentada en su contra y ordenamos el archivo de ésta.

Se dictará sentencia de conformidad.

 La Contralor también le imputó conducta impropia al hijo del querellado, el Ledo. Gabriel Olivera Magraner, cuya intervención se limitó a emitir una opinión legal sobre los acuerdos relacionados con el financiamiento. No obstante, tras exa-minar las alegaciones de las partes al respecto, mediante Resolución de 3 de noviem-bre de 2000, ordenamos el archivo de la queja presentada contra el licenciado Olivera Magraner.

 Cabe señalar que el Procurador General presentó la referida querella luego de solicitarnos, mediante una moción informativa, que reconsideráramos nuestra decisión de ordenar la presentación de la querella. Inicialmente, en el informe que el Procurador General nos rindió, éste expresó que no contaba con evidencia suficiente para concluir que el querellado había incurrido en conducta antiética. Dada la pos-tura de la Oficina del Contralor, le ordenamos al Procurador General que suplemen-tara su informe. Aunque ello redundó en que en determinado momento el Procurador rindiera un informe enmendado apoyando las imputaciones expuestas en la queja de la Contralor, mediante la mencionada moción informativa, éste reafirmó su posición original. Aún así, considerada la alegación de la Oficina del Contralor sobre la con-ducta aritiética del querellado, le ordenamos al Procurador General que presentara la querella.

 Según surge del expediente, para la fecha de los hechos pertinentes al caso de autos, la organización de los servicios de salud se clasificaba según el nivel de complejidad. El nivel primario de servicio consistía en tratamiento ambulatorio o de naturaleza preventiva, disponible típicamente en los centros de diagnóstico y trata-miento municipales. El nivel secundario comprendía servicios de hospitalización ru-tinaria, ofrecidos de ordinario en los hospitales de área. Finalmente, el nivel terciario se refería a servicios especializados, disponibles usualmente en los hospitales regionales.

 Se trataba de la Ley para Reglamentar la Contratación entre el Gobierno e Intereses Privados para la Administración y Operación de Facilidades de Salud Gu-bernamentales, Ley Núm. 103 de 12 de julio de 1985, que fue derogada por la Ley Núm. 190 de 5 de septiembre de 1996. Ajuicio del licenciado Saldaña, las disposicio- *507 nes de dicho estatuto aplicaban a la Enmienda H. No obstante, según las estipula-ciones de hechos que sometieran el querellado y el Procurador General, las partes nunca llegaron a un acuerdo sobre el asunto porque el contrato original entre H.M.C.A. y el Departamento de Salud fue suscrito antes de la aprobación de la referida ley.

 Cabe señalar que en el caso HMCA P.R., Inc. v. Ileana Colón Carlo, FPE89-0623, instado ante la Sala de Carolina del entonces Tribunal Superior, la Oficina del Contralor estuvo representada por un bufete de abogados del cual el licenciado Sal-daña era socio. Durante los trámites de ese caso, los abogados de la Oficina del Contralor sometieron la Enmienda H suscrita el 24 de septiembre de 1987 y con vencimiento en 1997 como parte de los documentos, representando que ese era el acuerdo que vinculaba a las partes.
Conviene añadir que en julio de 1997, varios meses después que la Contralor presentara la referida queja disciplinaria, la Oficina del Contralor certificó que en mayo de 1997 había dispuesto del contrato originalmente suscrito por las partes en 1982, con sus enmiendas y anejos, porque éste perdió su utilidad.