*847 Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta,
a la cual se unen el
Juez Presidente Señor Hernández Denton y la Jueza Asociada Señora Rodrí-guez Rodríguez.
Disiento, pues entiendo que la prueba no demuestra de manera robusta y convincente(1) que el Ledo. Eduardo A. Betancourt haya participado en el esquema elaborado por su hermano, Ledo. Ciro Betancourt, para utilizar y apro-piarse de los fondos pertenecientes al querellante.(2)
El expediente demuestra, y así lo reconoce la Comisio-nada Especial en su informe, que lo único que relaciona al Ledo. Eduardo Betancourt con la conducta de su hermano es el que ambos compartieran una oficina bajo el nombre de “Bufete Betancourt” y el que su firma apareciera en una carta dirigida al querellante, Sr. Luis A. Moyet, en la cual se reconocía que el señor Moyet había depositado un dinero en una cuenta bancaria del bufete, que se había invertido parte de ese dinero y que el Ledo. Ciro Betancourt se había apropiado de otra parte del dinero depositado.
Sin embargo, el Ledo. Eduardo Betancourt ha alegado, desde el inicio de este proceso y del proceso ante el Tribunal de Primera Instancia al que hace referencia la opinión mayoritaria, que él nunca tomó dinero del querellante señor Moyet, no conocía la existencia del alegado depósito y no firmó la carta aludida. En efecto, cuando se compara la *848 firma en dicha carta que se alega es suya con todos los documentos firmados por él que obran en el expediente, la diferencia es patente, y en ausencia de una determinación de la Comisionada Especial negándole credibilidad al tes-timonio del Ledo. Eduardo Betancourt, esta discrepancia sólo puede llevar a la conclusión de que el Procurador General no pudo probar, mediante prueba robusta y convin-cente, que el querellado, en efecto, firmó la carta.
En su Informe, la Comisionada Especial encontró pro-bado lo siguiente:
10. El quejoso, Luis Moyet, le hizo entrega a los licenciados Betancourt de la suma de [$415,000] para ser depositados en una cuenta plica (“escrow”) a nombre de su bufete. Del total de ese dinero, [$300,000] fueron depositados con el conocimiento y la autorización del señor Moyet, en una cuenta en Paine Webber.
11. Los restantes [$115,000] fueron mantenidos en depósito con el bufete, con el conocimiento y la autorización del quejoso.
12. Posteriormente, el querellado Ciro Betancourt retiró [$50,000] de la cuenta de Paine Webber, dejando un balance de [$250,000].
13. Para el mes de julio de 1994, Ciro Betancourt se compro-metió a devolver el dinero por él utilizado. Luego utilizó [$115,000], por lo que la deuda ascendió a [$165,000], (Énfasis suplido.)(3)
La conclusión sobre la entrega del dinero a “los licencia-dos Betancourt” surge, estrictamente, de la carta en controversia.
En cuanto a esa carta, la Comisionada Especial expone lo siguiente:
15. El querellado Eduardo Betancourt asegura que él nunca suscribió esa carta y que la firma que aparece no es la de él. Aunque es cierto que la firma se observa diferente a la que figura en todos los demás documentos que obran en los diver-sos expedientes donde está la firma de él, no obstante, por no haber presentado prueba pericial a tales efectos, no es posible *849 llegar a la determinación de que no la suscribió. (Énfasis suplido.(4)
Surge, además, que la carta de referencia es realmente lo único que ata al Ledo. Eduardo Betancourt a los hechos antiéticos de su hermano. Según la Comisionada Especial:
30. En lo que respecta a Eduardo Betancourt, el quejoso afirmó en su queja que lo incluía porque suscribió en unión a su hermano el documento (carta de 3 de noviembre de 1994) haciéndose responsable por la utilización de los fondos objeto de controversia. (Énfasis suplido.(5)
Concluye, entonces, la Comisionada:
Analizando los hechos a la luz de lo que contemplan dichos cánones, podemos concluir que aunque no hay ninguna evi-dencia de que el querellado Eduardo Betancourt utilizara los fondos del cliente Moyet para su uso personal, no obstante, éste formaba parte del Bufete Betancourt y el bufete fue el depositario de los fondos del señor Moyet. (Enfasis suplido.(6)
Expone que “no duda” que el Ledo. Eduardo Betancourt “no tuvo participación alguna” en las transacciones entre su hermano y el señor Moyet, y que éste era cliente del Ledo. Ciro Betancourt y no del Ledo. Eduardo Betancourt. No obstante, como el Ledo. Eduardo Betancourt no pudo probar, mediante prueba pericial, que su firma en la carta fue falsificada, la Comisionada Especial concluye que éste conocía lo que estaba sucediendo, violó “su responsabili-dad” como miembro del bufete y de esa manera incurrió en la falta de diligencia prohibida por los Cánones 18 y 19 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.(7)
*850 Concluye, además, que por la única razón de ser parte del “Bufete Betancourt”, el Ledo. Eduardo Betancourt tam-bién violó el Canon 21, que requiere lealtad a los intereses del cliente, así como el Canon 23 que protege la relación fiduciaria entre abogado y cliente. 4 L.P.R.A. Ap. IX. Todo ello a pesar de que quedó demostrado que el señor Moyet no era cliente del Ledo. Eduardo Betancourt, sino de su hermano, y que no participó en los malabares económicos que ideó su hermano.
Ante lo anterior no podemos concluir, como lo hace la mayoría, que la prueba mostrara —robusta y convincente-mente— la participación del Ledo. Eduardo Betancourt en las violaciones éticas de su hermano. No se demostró que fuera depositario del dinero que el señor Moyet confió al Ledo. Ciro Betancourt. No hay prueba alguna de que el Ledo. Eduardo Betancourt haya usado el dinero para su uso personal ni de que éste “le imprimió un uso distinto a los fondos confiados al Bufete Betancourt y no cumplió con lo acordado y deseado por el señor Luis A. Moyet”, según expone la opinión mayoritaria en sus páginas 18 a 19.
Sencillamente, la prueba no sostiene las conclusiones fácticas en las que se apoya la mayoría para concluir que el Ledo. Eduardo Betancourt violó los Cánones 18, 19, 21, 23 y 35 del Código de Etica Profesional.
En cuanto al Canon 38, éste, en lo pertinente, dispone lo siguiente:
El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. (Énfasis suplido. )(8)
*851 Con la prueba sometida en este caso, tampoco podemos concluir que el Ledo. Eduardo Betancourt no estuvo a la altura del sacrificio personal que requiere el Canon 38, al no fiscalizar la conducta de su hermano, pues tendríamos que inferir que esa obligación surge del sólo hecho de que trabajaban en la misma oficina. Ni los cánones de ética profesional ni su jurisprudencia interpretativa exigen que los abogados, socios de un bufete, sean responsables por las violaciones éticas en que incurran sus pares.(9)
Resaltamos a este punto que la Comisionada Especial reconoce en su Informe lo siguiente, como factores ate-nuantes que este Tribunal debe considerar:
2) Su incumplimiento con los Cánones de Etica no proviene de actuaciones intencionales de él, ni de un patrón de conducta establecido. Por el contrario, es un hombre mayor que lo per-cibimos como una persona seria y respetuosa en todos los órde-nes de la vida, aunque excesivamente confiado, lo que lo llevó al descuido.
4) No se aportó evidencia alguna que demostase que el quere-llado se lucró personalmente. Por lo contrario, se afectó económicamente.
5) Su papel fue pasivo en toda la controversia que dio origen a la queja que desencadenó en el procedimiento disciplinario que nos ocupa. De hecho, el quejoso afirmó en su queja que sólo lo incluyó por haber suscrito la carta del 3 de noviembre de 1994 con su hermano Ciro Betancourt. (Énfasis suplido.(10)
Por todas estas razones, disiento de la opinión mayori-taria y ordenaría que se desestimara y archivara la querella.

 El criterio que utiliza este Tribunal en casos disciplinarios es el de prueba clara, robusta y convincente. In re Caratini Alvarado, 153 D.P.R. 575 (2001). Ello porque los casos disciplinarios contra los miembros de este Foro inciden sobre el derecho fundamental de los abogados a ganarse su sustento. Amy v. Adm. Deporte Hípico, 116 D.P.R. 414, 421 (1985). Para tales casos, en los cuales se niega un derecho fundamental, el debido proceso de ley exige que el valor y suficiencia de la prueba sea medida con un criterio más riguroso que la preponderancia de la prueba, sin que se le aplique e el criterio de “prueba” más allá de duda razonable. In re Ríos Ríos, 175 D.P.R. 57 (2008).

 Según explica la opinión mayoritaria, Ciro Betancourt fue suspendido inde-finidamente del ejercicio de la profesión, aunque por otras razones.

 Informe al Honorable Tribunal Supremo de la Comisionada Especial, 17 de marzo de 2008, págs. 28-29.

 Informe al Honorable Tribunal Supremo de la Comisionada Especial, 17 de marzo de 2008, pág. 80.

 Íd., pág. 34.

8) Íd., págs. 34-35.

 El Procurador General es quien debió probar mediante evidencia clara, ro-busta y convincente que el Ledo. Eduardo Betancourt firmó la carta. Además, sabe-mos que no es necesario o imperativo presentar prueba pericial para demostrar un *850 hecho particular, sino que ésta es permitida “[cluando conocimiento científico, técnico o especializado sea de ayuda para el juzgador entender la evidencia o determinar un hecho en controversia ...”. Regla 52 de Evidencia de Puerto Rico, 32 L.P.R.A. Ap. IV. Véanse, además: E.L. Chiesa, Tratado de derecho probatorio: Reglas de Evidencia de Puerto Rico y federales, República Dominicana, Ed. Corripio, 1998, T. I, págs. 543-544; Vélez Rodríguez v. Amaro Cora, 138 D.P.R. 182, 194 (1995).

 4 L.P.R.A. Ap. IX.

 La Regla 5.1 de los Model Rules of Professional Conduct del American Bar Association exige a los socios de un bufete esfuerzos razonables para tomar medidas con el propósito de que los abogados de la firma actúen éticamente. No obstante, dicha norma no ha sido adoptada en nuestra jurisdicción.

 Informe al Honorable Tribunal Supremo de la Comisionada Especial, 17 de marzo de 2008, págs. 37-38.